Opinion
 

 MORRISON, J.
 

 Evidence Code section 1108 allows bad conduct evidence to be admitted to prove “predisposition” to commit sex crimes. (Further unspecified section references are to this code.) Recently we rejected a due process clause challenge to the statute, emphasizing “section 1108 has a safeguard against the use of uncharged sex offenses in cases where the admission of such evidence could result in a fundamentally unfair trial. Such evidence is still subject to exclusion under Evidence Code section 352. ... By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. . . . This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.”
 
 (People
 
 v.
 
 Fitch
 
 (1997) 55 Cal.App.4th 172, 183 [63 Cal.Rptr.2d 753]
 
 (Fitch),
 
 citations omitted.)
 

 Often predisposition evidence is extremely
 
 probative
 
 (e.g.,
 
 Michelson
 
 v.
 
 United States
 
 (1948) 335 U.S. 469, 475-476 [69 S.Ct. 213, 218-219, 93 L.Ed. 168, 173-174];
 
 People
 
 v.
 
 Alcala
 
 (1984) 36 Cal.3d 604, 630-631 [205 Cal.Rptr. 775, 685 P.2d 1126]), and that explains why a complex set of exceptions to the “general rule” of inadmissibility developed, particularly in sex cases, prior to the adoption of section 1108. (See
 
 Fitch, supra,
 
 55 Cal.App.4th 172.) Our conclusion in
 
 Fitch
 
 was based on the assumption that section 352 provided a realistic safeguard that ensures that the presumption of innocence and other characteristics of due process are not weakened by an unfair use of evidence of past acts. In this case the safeguard failed. We shall reverse.
 

 I
 

 Defendant, a mental health nurse, worked at the Sacramento Mental Health Treatment Center (Mental Health). He was accused of preying on women who were vulnerable due to their mental health condition. A jury convicted him of several sex offenses, and he admitted a prior burglary conviction. He was sentenced to 47 years in state prison.
 

 
 *731
 
 The first victim, Tracy, age 34 at trial, testified to an incident which occurred in November 1995. She has a long history of mental problems, including delusions and hallucinations. Usually she knows the hallucinations are not real. Sometimes she feels she is distant from her body, or “dissociating.” She is always on medications, such as Paxil, Haldol, Depakote and Risperidone.
 

 Tracy’s mother admitted her for treatment on November 3, 1995, for fear Tracy would hurt herself. At the time Tracy was on Haldol and Prozac. She knew defendant from previous hospitalizations and thought he was “one of the best nurses,” and he “went the extra mile” for her. On that day she heard other nurses calling people for lunch. She was extremely depressed and “felt very far from my body. I felt like I couldn’t move.” Defendant and another nurse came into the room, but defendant told the other nurse he would “take care of [her].” He lifted her clothes and licked her breasts, then sucked on one breast. (Count I—Pen. Code, § 243.4, subd. (b).) She felt his whiskers. Then he put his hand down her pants and rubbed her clitoris. (Count II—Pen. Code § 289, subd. (b), see pt. V.,
 
 post.)
 
 Then he rearranged her clothes and kissed her on the mouth. Then he took her hand and used it to rub his penis through his pants. (Count III—Pen. Code, § 243.4, subd. (c).) She felt like yelling but could not, because she was scared and dissociated. One hour later he returned to her room and she was able to sign a medication consent form.
 

 A couple of days later she told her mother what had happened. She did not tell anyone in authority about it until a few weeks later at Turning Point, which is a therapy center adjacent to Mental Health. There, in a group session on “shame” she said she had been molested at Mental Health. Brenda, another woman in the group session, spoke with her later and asked her what the man’s name was. When Tracy told her, Brenda said she had seen him outside of the hospital, he was “very fatherly and overly friendly,” and had talked her (Brenda) into going out with him. Brenda told Tracy defendant forcibly orally copulated her.
 

 Tracy had no doubts that her story was “real.”
 

 Brenda, age 29 at trial, married with two children, suffered from suicidal depression and was admitted (involuntarily) to Mental Health on October 12, 1995. She met defendant there. She was released a few days later and after she tried to kill herself was readmitted on October 31, 1995. Defendant was a crisis unit nurse and was kind to her.
 

 She was sent to Turning Point where she stayed seven days. Defendant checked on her there. They met for a cigarette and he told her she became
 
 *732
 
 more beautiful each time he saw her. He wanted to “follow-up” with her after she left Turning Point so she gave him her telephone number. That night (a Saturday) he called her and invited her to go out on his boat. She arranged to go with him on Monday. They met furtively and went to the Miller Park marina. They headed north up the Sacramento River, then east up the American River. They anchored, drank wine, orally copulated each other and had intercourse.
 

 Brenda was released to her home on Wednesday and on Friday defendant invited her to lunch. Defendant called her on Monday, November 13, 1995, and then came to her house. She told him she was making lunch for her child and he volunteered to go to the store. She told him she needed to take her child to school and told him he could wait.
 

 When she returned she told him she needed to shower and he asked to join her; she refused. After she got out and dressed he hugged her and kissed her; she did not kiss him back. She said she did not want “to do that.” She kept saying no but he struggled to take off her clothing and eventually after mouthing her breast, he fingered and mouthed her vagina. (Counts IV-VI— Pen. Code, §§ 243.4, subd. (a), 289, subd. (a), 288a, subd. (c).) During this ordeal he was making guttural, growling noises and she was crying and had pulled a pillow over her face. She testified she told him “no” at least 30 times. Eventually her crying, which “got almost hysterical” deterred him. After he finished he stopped the growling, removed the pillow over her head, tried to soothe her and helped her dress. She took off her clothes and allowed him to rub her back and legs on the floor, with lotion, while she was covered with a towel, because he seemed to be acting normally. Then he said he should leave “before he did something stupid,” motioning toward his pants.
 

 Brenda next saw him on Monday, November 27, when they went to lunch together. The first time she told anybody about seeing him was at the Turning Point meeting about shame that night. She was confused because she liked defendant and because she did not know if it would be wrong because she had previously consented to have sex with him. She claimed Tracy described to her a similar sort of guttural, whining noise that defendant made, and mentioned that defendant had helped her put her clothes back in place. Tracy mentioned no such noise in her testimony.
 

 The defense to Tracy’s allegations was that she was hallucinating, as evidenced by her medical history and by discrepancies in her story, particularly her claim that it was defendant who had her sign the consent form, when her own doctor testified that she, the doctor, did so. The defense as to Brenda’s allegations was an amalgam of consent, reasonable belief in consent and an emphasis on Brenda’s desire to excuse her adultery. The defense
 
 *733
 
 also made much of the “pollution” between the two cases, since the victims spoke to each other in detail.
 

 We express no disagreement with the jury’s resolution of these factual matters, we merely point out that the defendant had a strong defense on each count.
 

 II.
 

 Into this structurally routine factual dispute, the prosecution sought to inject evidence of past violent criminal behavior committed by defendant.
 

 The facts of the prior conduct were redacted to a point that the jury must have come away with a misleading impression of what happened, and this process of rewriting the facts, although it is at times necessary to further justice, is itself troubling. A trial is a search for truth. (Pen. Code, § 1044;
 
 People
 
 v.
 
 Mendez
 
 (1924) 193 Cal. 39, 46 [223 P. 65], overruled on another point,
 
 People
 
 v.
 
 McCaughan
 
 (1957) 49 Cal.2d 409, 420 [317 P.2d 974];
 
 People
 
 v.
 
 Zack
 
 (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317] [Zack “not entitled to have the jury determine his guilt or innocence on a false presentation” of evidence of his prior bad acts]; see
 
 In re Littlefield
 
 (1993) 5 Cal.4th 122, 131 [19 Cal.Rptr.2d 248, 851 P.2d 42].) To the extent possible, jurors must be
 
 told
 
 the truth if they are to
 
 find
 
 the truth.
 

 The prosecutor stated that “the true details of that crime would so shock a jury and have shocked me to the point that I would agree with the full evidence of that case, Mr. Harris could not get a fair trial.” Instead the prosecutor wanted to introduce a skewed, denatured version which would bolster the chance of conviction, but comport with law.
 

 The
 
 facts
 
 are these: In 1972 defendant was a state employee, working as a psychiatric technician at Pacific State Hospital. He also was an assistant manager of his apartment complex in Covina, which apparently enabled him to obtain a set of keys, including keys to the apartment of the victim. He entered at night while she was sleeping, beat her unconscious and used a sharp instrument to rip through the muscles from her vagina to her rectum, then stabbed her in the chest with an ice pick, leaving a portion of the pick inside her. Police found her beaten unconscious on the floor, bleeding heavily from the vaginal area and bleeding from the mouth and nose. Defendant was found hiding nearby with “blood on his hands, blood on his clothes, blood on his thighs, blood on his penis.” When arrested he had a key ring on a finger and one of the keys fit the victim’s apartment door. There is no evidence the victim had ever been a patient at the hospital where defendant worked.
 

 
 *734
 
 The jury was given the following altered version of the crime: Robert Anderson, now a captain of the Santa Rosa Police Department, was working in Covina on July 16, 1972, and, about 3:30 a.m., was sent to an apartment building. A woman was whispering down to him and other officers, who went up some stairs. They heard a door slam and ran up to the woman, who reported strange noises in the apartment next to hers. Officer Ronald Gaunt took a screen off of a window and went inside, then opened the door to let Anderson in and told him “there appeared a rape had taken place inside the apartment.”
 

 At this point the trial court struck the reference to a rape and, after the jury was excused, denied defendant’s motion for a mistrial. The jury was brought back and the tale resumed.
 

 Anderson saw the victim on the floor. “She was lying on her back. And her, her legs were toward the door that I walked in with her legs spread apart. She was naked from the waist down with a nightgown on her upper body. And there was blood on her vagina and mouth area along with swelling on the right side of her face. She was—appeared to be unconscious.” As he waited with the victim for an ambulance to arrive, defendant was brought to him in handcuffs and Anderson saw blood on the upper area of his pants and, upon deeper inspection, his shorts. Defendant was “yelling and agitated.”
 

 Hugh Keating, now employed by the Department of Justice in El Centro in narcotics enforcement, was an investigator in 1972. He saw defendant at the police station, and defendant had blood “on the inside of his thighs and on his penis.” Defendant’s jockey shorts were also bloody.
 

 Ronald Gaunt testified he heard a “low moan and a groan sound” before he removed the window screen and went into the apartment. “I saw a lone white female laying semi on her back. Appeared to be either unconscious or semi-unconscious and at that point I then checked to be sure she was breathing and still alive. She was swollen real severely about the head and face. I couldn’t tell if she was injured in the crotch and lower stomach area or not due to the blood.” “[S]he was laying on kind of a pile of material and when I checked her, her pulse, she was wearing a nightgown or semi nightgown and I think that’s all she had on, because it was stained up in the chest area and lower portion pulled up or at that time was all gathered up around the stomach area here and that was all she had on.” After the ambulance was called Gaunt hunted for the suspect and found defendant hiding in a nearby sealed veranda that was used to store supplies for the pool. Defendant was holding a key ring and had blood on the lower part of
 
 *735
 
 his shirt, “all over the front crotch and stomach area.” Gaunt checked further and saw blood on the inside of defendant’s clothes and on his penis. He testified that defendant was bom in 1943 and the victim was a white female, 23 years old.
 

 It was stipulated that “as a result of Mr. Harris’ conduct surrounding this incident, he was convicted of first degree burglary with the infliction of great bodily injury.”
 

 The following excerpts from the prosecutor’s closing argument show how the redacted evidence was argued to the jury:
 

 “You do not need to be Hercule Poirot or Sherlock Holmes to figure out what happened in that incident, do we? . . . [*5Q He viciously sexually assaulted her. That’s circumstantial evidence. And it is absolutely compelling.”
 

 “He picks on people who can’t or who won’t [fight back]. Now, we don’t know about Noreen [B.] . . . did she fight back? Did Mr. Harris learn a lesson about who his victims were going to be, because now who does he pick on. Those who won’t and those who can’t. The weakest.”
 

 “What you are going out find out as you see the evidence in this trial what Mr. Harris does is a little bit sophisticated and a little bit subtle. You see, he uses whatever it takes. Whatever it takes to get what he wants, [^fl What did it take with Noreen [B.]? What did it take with Tracy [S.]? What did it take with Brenda [P.]? [W]hatever he needs to do.”
 

 “[Brenda] could be sexually assaulted all the time because she’s a person who is not going to fight back physically. [^Q [A] woman is not required to end up in the condition of Noreen [B.]. You are not required to do that.”
 

 “What about Noreen [B.]? What about her? And how are you to use that evidence and what does it mean? Because as you know now although we have two women separated in time and space with one common thing this person as a caretaker of them. We now know that there was another who you never met but you know a lot about her Noreen [B.J Ffl] And how do you use that in evaluating whether or not, how does that help you in figuring out whether these crimes were committed? [^D It is interesting you know that we have two separate women saying this but, oh, my gosh, their stories are vastly different, aren’t they? They are vastly different situations. But now you find out about a third. fiO And the first thing I will say about that is, what you find out as I talked to you before it should be apparent that Mr.
 
 *736
 
 Harris’ style, MO if he has an MO, is that he does whatever it takes. [<JQ With Tracy [S.] there is no fighting; with Brenda [P.] there is minimal physical resistance; with Noreen [B.] it looks like that was a whole other matter.”
 

 “[W]ould the fact that somebody previously committed a sexual assault against a female, would that help you in determining whether or not that person has committed a sexual assault now. HI] ... It helps a lot.”
 

 “And what you should know now beyond any doubt, not only beyond a reasonable doubt is that Mr. Harris has a character trait for this, [f] He’s gonna take sex from women. And he’s going to use whatever means of force necessary.”
 

 III.
 

 Section 1101, subdivision (a) provides: “Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person’s character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.” Subdivision (b) allows the admission of a crime, civil wrong, or other act to prove a fact, such as motive, intent, common plan, or identity, other than disposition.
 

 Section 1108, subdivision (a) provides: “In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant’s commission of another sexual offense or offenses is not made inadmissible by Section 1101,
 
 if the evidence is not inadmissible pursuant to Section 352.”
 
 (Italics added.) Section 352 provides: “The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.”
 

 The two crucial components of section 352 are “discretion,” because the trial court’s resolution of such matters is entitled to deference, and “undue prejudice,” because the ultimate object of the section 352 weighing process is a fair trial.
 

 Discretion is delimited by the applicable legal standards, a departure from which constitutes an “abuse” of discretion.
 
 (City of Sacramento
 
 v.
 
 Drew
 
 (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) “The discretion intended ... is not a capricious or arbitrary discretion, but an impartial
 
 *737
 
 discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised
 
 ex gratia,
 
 but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.”
 
 (Bailey
 
 v.
 
 Taaffe
 
 (1866) 29 Cal. 422, 424; see
 
 Jenkins
 
 v.
 
 Gamewell etc. Tel. Co.
 
 (1892) 3 Cal.Unrep. 655.)
 

 “ ‘The prejudice which [section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.’ [Citations.] ‘Rather, the statute uses the word in its etymological sense of “prejudging” a person or cause on the basis of extraneous factors.’”
 
 (People
 
 v.
 
 Zapien
 
 (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Painting a person faithfully is not, of itself, unfair.
 

 Every case on the application of section 352 to other-crimes evidence predates section 1108. As the trial court in this case realized, and as we held in
 
 Fitch,
 
 section 1108 passes constitutional muster if and only if section 352 preserves the accused’s right to be tried
 
 for the current offense.
 
 “A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is.”
 
 (United States
 
 v.
 
 Myers
 
 (5th Cir. 1977) 550 F.2d 1036, 1044, 42 A.L.R.Fed. 855; see
 
 People
 
 v.
 
 Garceau
 
 (1993) 6 Cal.4th 140, 186 [24 Cal.Rptr.2d 664, 862 P.2d 664] [use of such evidence may dilute presumption of innocence].) The factors we consider are derived from the text of section 352 and the cases which have arisen in the context of the use of prior conduct admitted under section 1101. We recognize that different considerations may apply in the context of section 1108. However, section 1108 functions as another albeit much broader exception to the general rule of exclusion of other-crimes evidence.
 

 In a case addressing the use of other-crimes evidence under sections 1101 and 352, the California Supreme Court has stated that “because other-crimes evidence is so inherently prejudicial, its relevancy is to be ‘examined with care.’ [^Q . . . [I]t is inadmissible if not relevant to an issue expressly in dispute [citation], if ‘merely cumulative with respect to other evidence which the People may use to prove the same issue’ [citation], or if more prejudicial than probative under all the circumstances.”
 
 (People
 
 v.
 
 Alcala, supra,
 
 36 Cal.3d at pp. 631-632.)
 

 IV.
 

 We set out a series of “factors” and discuss each.
 

 Inflammatory nature of evidence.
 

 In
 
 People
 
 v.
 
 Ewoldt
 
 (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], the California Supreme Court (at p. 405) deemed it important in
 
 *738
 
 evaluating prior uncharged acts pursuant to section 352, whether “[t]he testimony describing defendant’s uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses.”
 

 The trial court found the evidence was “inflammatory.” We agree, but clarify that the evidence was inflammatory
 
 in the extreme.
 
 Without minimizing the trauma suffered by each victim, at worst defendant licked and fondled an incapacitated woman and a former sexual partner, both of whom were thereafter on speaking terms with him. Although the assaults described by Tracy and Brenda are criminal, involving a breach of trust by a caregiver, the abuse the victims suffered is, unfortunately, not unusual or shocking. On the other hand, the evidence of the 1972 incident described a viciously beaten and bloody victim who as far as the jury knew was a stranger to the defendant. The defendant’s role in the attack and his subsequent conviction for burglary, while apparently violent and sexual, is unexplained. The jury is simply told that defendant was convicted of burglary with the infliction of great bodily injury.
 

 The charged crimes involving a breach of trust and the “taking advantage” of two emotionally and physically vulnerable women are of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury. The version that the jury heard, while not as gruesome as the actual incident, was an incomplete and distorted description of an event that did not actually occur. As disturbing as the actual incident was, it was at least coherent, while on the other hand, the crime testified to by the officers must have caused a great deal of speculation as to the true nature of the crime.
 

 The inflammatory and speculative nature of the evidence weighs sharply in favor of exclusion.
 

 Probability of confusion.
 

 The defense, at the trial court’s suggestion, wanted the jury to
 
 leam that
 
 defendant was convicted of a crime based on this incident, specifically, burglary with great bodily injury, to avoid the possibility that the jury would conclude defendant had not been punished for his actions and would want to “punish” the defendant now. This did not help matters. The jury would at best have concluded that defendant escaped appropriate rape charges and was
 
 merely
 
 convicted of burglary, leaving the rape victim unrevenged. (See
 
 People
 
 v.
 
 Ewoldt, supra,
 
 7 Cal.4th at p. 405 [“This circumstance increased the danger that the jury might have been inclined to punish defendant for the uncharged offenses . . . and increased the likelihood of ‘confusing the
 
 *739
 
 issues’ . . . (In fact, the
 
 truth
 
 is that this appears to be exactly what happened, because defendant was allowed to plead guilty to the burglary in exchange for dismissal of sexual assault charges, and was treated under the former Mentally Disordered Sex Offender law.)
 

 The probability of confusing the jury with this evidence weighs in favor of exclusion.
 

 Remoteness.
 

 Defendant points to the age of the incident, which occurred in 1972, and defendant’s unblemished life since that time until the present charges. “Remoteness” or “staleness” of prior conduct is an appropriate factor to consider in a section 352 analysis.
 
 (People
 
 v.
 
 Burns
 
 (1987) 189 Cal.App.3d 734, 737-739 [234 Cal.Rptr. 547].)
 

 Although there is no bright-line rule, 23 years is a long time. The defendant was paroled in 1978 and was 52 years old at the time of trial. The trial court found this incident was “really old.”
 
 (People
 
 v.
 
 Burns, supra,
 
 189 Cal.App.3d at p. 738 [“a conviction that is 20 years old . . . meets any reasonable threshold test of remoteness].”) We agree.
 

 The Attorney General correctly observes that “staleness” of an offense is generally relevant if and only if the defendant has led a blameless life in the interim. The Attorney General contends defendant has not led a blameless life, because in 1991 he was convicted of misdemeanor drunk driving “as reflected in the probation report.” (Thus conceding this point was not before the trial court when it ruled.) But the issue is not impeachment, it is the question of predisposition to commit the charged sexual offenses. A conviction for driving under the influence is simply not relevant to this issue.
 

 The remoteness of the evidence weighs strongly in favor of exclusion.
 

 Consumption of time.
 

 Putting aside the time necessary to track down the witnesses and attempt to locate the victim, the actual testimony occupies but 25 pages of transcript and therefore cannot, standing alone, be viewed as protracted. But the evidence necessitated lengthy instructions and admonitions and occupied a good portion of the closing arguments. On balance, the trial court could find this factor weighed in favor of admission, but not strongly so.
 

 Probative value.
 

 “On the issue of probative value, materiality and necessity are important. The court should not permit the admission of other crimes until it
 
 *740
 
 has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution’s case, and is not merely cumulative.”
 
 (People
 
 v.
 
 Stanley
 
 (1967) 67 Cal.2d 812, 818-819 [63 Cal.Rptr. 825, 433 P.2d 913], fns. omitted.)
 

 The trial court found the evidence was highly relevant for the following reasons: “[I]t clearly has relevance and most importantly with regard to the disposition issue, I think, it is highly probative not just because it is sexual misconduct but it involves women, it involves Caucasian women. It involves Caucasian woman that [are] in this 20 or 30 year age bracket. It involves coercion, some element of force. It involves vaginal involvement. So there is some similarity there that is not as detailed as will be required for example under [section 1101]. But it’s there and it has force, I believe, substantive force with regard to the issue of predisposition.” The trial court also mentioned the fact that the evidence was “independent” from the current charges and “the fact that there was a conviction adds somewhat to the probative value.”
 

 In this the trial court erred. “No evidence is admissible except relevant evidence.” (§ 350.) Evidence is relevant if and only if it has a “tendency in reason to prove or disprove any disputed fact that is of consequence” to the case. (§ 210.)
 

 The evidence did little more than show defendant was a violent sex offender. The evidence that defendant committed a violent rape of a stranger, as the jury was led to believe, did not bolster Tracy’s or Brenda’s credibility nor detract from the evidence impeaching their stories.
 

 Although this is not a section 1101 case, the trial court properly took into consideration the degree of similarity of the prior and current offenses, as similarity would tend to bolster the probative force of the evidence. We agree with the trial court that the degree of similarity present is not sufficiently distinctive to make the evidence admissible under section 1101, and agree that it did not need to be. But we disagree with the trial court’s view that there was any meaningful similarity at all. The prior conduct evidence is so totally dissimilar to the current allegations that the trial court’s finding that it was very probative fails to answer the question: Probative
 
 of what?
 
 The trial court pointed to the fact all 3 women were Caucasian and in their 20’s or 30’s. These “similarities” are not significant. The defendant is also Caucasian and the “20’s or 30’s” is a wide age group that includes the majority of the victims of sexual assaults. This altered version of a 23-year-old act of inexplicable sexual violence while heavy with “undue prejudice”
 
 *741
 
 and dangerous in the hands of a jury was not particularly probative of the defendant’s predisposition to commit these “breach of trust” sex crimes.
 

 The additional factors mentioned, the “independent” source of the evidence and the fact it led to a conviction do not make the evidence more probative on any disputed issue in the case.
 

 The lack of any significant probative value on a disputed issue weighs strongly in favor of excluding this evidence.
 

 Conclusion.
 

 The only factor favoring admitting this evidence is that it did not consume much time. Everything else militates against admission: The evidence was remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses.
 

 Absent a “miscarriage of justice,” we may not reverse a judgment. (Cal. Const., art. VI, § 13.) While the Attorney General does not argue harmless error, in his discussion of relevance he states: “Appellant seeks to support the need to exclude the evidence by emphasizing the weakness of the prosecution’s case based on Tracy’s mental illness and Brenda’s inconsistent actions. In doing so, appellant
 
 highlights
 
 the need for the illuminating evidence. The evidence is clearly not cumulative, and is clearly relevant, not only to show that appellant has a predisposition to commit sexual offenses, but also to rebut his defense that he believed Brenda consented to their second sexual encounter, and to corroborate both victims, who, as appellant points out, are particularly susceptible to doubt.”
 

 The People’s argument illustrates the critical and unfairly prejudicial nature of this evidence.
 

 The error was prejudicial. Absent the evidence of this 23-year-old act of unexplained sexual violence, it is “reasonably probable” that the jury would have acquitted the defendant.
 
 (People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818 [299 P.2d 243].)
 

 V.
 

 We reject defendant’s challenge to the sufficiency of the evidence of penetration as to count II. Tracy’s detailed testimony establishes penetration.
 

 None of the other issues raised require discussion.
 

 
 *742
 
 Disposition
 

 The judgment is reversed.
 

 Blease, Acting P. J., and Callahan, J., concurred.
 

 A petition for a rehearing was denied January 30, 1998, and respondent’s petition for review by the Supreme Court was denied April 15, 1998.