Filed 7/29/13  P. v. Renshaw CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | C066537 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF080039) |
| v. | |
| EDWARD CHE RENSHAW, | |
| Defendant and Appellant. | |

A jury convicted defendant Edward Che Renshaw as charged of four felony sex offenses against alleged victim C., and found he had substantial sexual contact with her and caused her great bodily injury in connection with two of the counts.[1]  (Pen. Code, §§ 288, subd. (a) [lewd act with child under 14], 288.5, subd. (a) [continuous sexual abuse of child under 14], 288.7, subds. (a) [sodomy with child 10 or younger] & (b) [oral copulation or sexual penetration with child 10 or younger], 1203.066, subds. (a)(2) & (a)(8).)  The trial court sentenced defendant to prison for 18 years, consecutive to a term of 40 years to life, and defendant timely appealed.

On appeal, defendant contends no substantial evidence supports count two because the victim was over 10 (but not yet 11) and the relevant statute requires that the victim be "10 years

_____

[1]  We refer to C. and several witnesses by first names or by initials, to protect their privacy.  We note that some names are spelled differently in different parts of the record.

1

of age or younger." (Pen. Code, § 288.7, subd. (a).) He also claims the trial court erred by permitting the People to introduce prejudicial uncharged act evidence showing he committed sexual offenses against other girls and young women. Finally, defendant contends the trial court should have granted his motion for a new trial based on juror misconduct.

As we explain, we find no error. Accordingly, we shall affirm the judgment.

## FACTS

*People's Case*

The charged offenses as described by C. were partly corroborated by circumstantial evidence, and partly corroborated by uncharged act evidence showing defendant sexually victimized other girls and young women, reflecting his predisposition to commit such offenses, and in some cases showing his intent, motive, common plan, and opportunity. (See Evid. Code, §§ 1101, subd. (b) (§ 1101(b)), 1108 (§ 1108).)

*C.'s Trial Testimony*

C. testified defendant was her second cousin, but she called him uncle.[2] C. lived in the same house as defendant, with defendant's mother, for about two months beginning in October 2005, and later from January 2006 to February 4, 2007, on Park Avenue. C. shared a bedroom with her two younger sisters, and defendant shared a bedroom with his then-girlfriend Michele and his son, I.

A few weeks after C. moved back to the Park Avenue home, in January 2006, while they were in the garage, defendant asked C. to suck his penis, and he instructed her how to do this while rubbing her vagina and "butt" over her clothing. Defendant told C. he would kill her mother and sisters, which scared her. He made her do it again in his bedroom a few days later, and ignored her pleas to stop. Between January 2006 and her 10th birthday in June 2006, defendant made C. suck his penis "over 50" times and also stuck his finger in her vagina many times, which hurt and caused bleeding, again ignoring her pleas.

_____

[2] C. was born in June1996, and defendant was born on December 6, 1987.

2

Once, after she turned 10, but before she turned 11, and before she went on a school trip,[3] defendant stuck a pencil in C.'s vagina, and once he stuck a phone antenna in her vagina, both times making her bleed.

Shortly before C. returned from the school trip, defendant's son E. was born.[4] During the period between her 10th birthday (June 2006) and the school trip, defendant stuck his fingers in C.'s vagina "Like over 20" times. He would alternate, making her suck his penis one day and sticking his fingers in her vagina the next day. C. did not cry out because she was afraid. After C. went on the trip, defendant sodomized her, which hurt and caused bleeding. He sodomized her five to six times per week, and generally made her suck his penis or would put his fingers in her vagina before he did so. Between the time E. was born (September 2006) and the time C. turned 11 (June 2007), defendant sodomized her over 90 times, and made her suck his penis and put his fingers in her vagina over 25 times. Once, defendant's mother came in when defendant had his penis in C.'s rectum.[5] Once, defendant's girlfriend Michele walked in when defendant had his fingers in C.'s vagina, but C. was under a blanket.[6]

After C. moved with her family to Julie Drive, defendant rented an apartment in the same complex, where he sodomized C. Between the time C. turned 11 and the last time he abused her, defendant sodomized her about 10 times, made her suck his penis, and stuck fingers in her

_____

[3] Records showed C. was at a school trip from September 25-29, 2006.

[4] Defendant's son, E. was born in September 2006.

[5] Defendant's mother testified and denied she had ever walked in on defendant and C. having sex.

[6] Michelle S., mother of defendant's two sons, testified that she once saw defendant and C. under a blanket together, and they both jumped up. On cross-examination, Michele testified she thought C. was giving defendant a back rub.

vagina. Once defendant's girlfriend Amber walked in while C. had her pants down and defendant was about to sodomize her.[7]

C. kept her eyes closed during the abuse, but saw defendant's penis once when he got up to answer the phone, and saw one half was lighter than the other, and she later saw a picture of his penis on Amber's phone.[8]

The last time defendant abused C., on July 28, 2007, he put the tip of his penis in her vagina.

Defendant sometimes gave C. a dollar, or candy, or promised to buy her clothing, but he never did. C. eventually told two friends about the abuse, but said she would never tell her mother until defendant was dead because she was scared. When C. finally reported the abuse, she was too embarrassed to give all the details.

*Other Testimony Related to C.'s Claims*

C.'s mother testified she was defendant's mother Virginia's first cousin, and she initially left C. and other daughters with Virginia due her own drug addiction and financial straits. Later, in February 2007, she rented an apartment on Julie Drive, where she lived with her daughters. She refused to let defendant move in when he asked, but he moved into another apartment in the same complex.

According to authenticated school records, C. enrolled in a Yuba City elementary school on October 14, 2005, with a listed home address on Park Avenue. C. moved to a Sacramento school on November 18, 2005, but returned to Yuba City on January 17, 2006, finished fourth

_____

[7] Amber M. testified that she was defendant's girlfriend from early 2007 to 2008; she once came back to defendant's apartment after leaving work early and found him and C. under a blanket; he looked "startled" and "surprised" and C. looked scared.

[8] A former investigator testified C. had denied having seen a photograph of defendant's penis, but said she saw it in person. Several witnesses described the different skin colors on defendant's penis. Amber confirmed that she had a picture of said penis on her phone. While C. was playing with her phone in the summer of 2007, C. asked "'Why do you have a picture of my uncle's penis?'" Amber had not told C. whose penis it was, and when she asked how C. knew it was defendant's, C. looked shocked and did not answer.

and fifth grade there, then went to a middle school beginning on August 20, 2007, all while living on Julie Drive.

A pediatric nurse practitioner and experienced child sexual assault examiner testified that most child sexual assault victims have normal examinations, particularly as the time lapsed from the last abuse increases. C.'s findings were indeterminate.

*Other Incidents*

Amber M. testified she had been defendant's girlfriend beginning in early 2007, and she also lived at the Julie Drive apartments. Amber was 26 or 27 during the relationship, and defendant forced himself on her many times. The first time, when they were having intercourse, he choked her and sodomized her even though she told him to stop, then she lost consciousness. Thereafter, he forced himself on her almost on a daily basis, vaginally or anally, once using a "gigantic squash" in her vagina and once using a plastic shampoo bottle in her vagina. She was too scared to protest.

Amber went to Rocklin at defendant's request in December 2007, and defendant said this was because of a Sutter County warrant. Amber returned to Yuba City when her mother told her the police were looking for them, but defendant did not go with her, and told her to lie to the police or else he would go to jail.

Michele S. testified she once saw defendant and his niece M.M. in bed, sleeping. Near Thanksgiving 2007, while defendant was dating Amber, defendant forcibly had sexual intercourse with Michele, and made her suck his penis. She did not report the incident because she was scared of defendant, who was abusive. Before Michele reported defendant's abuse to the police, on about December 6, 2007, Michele stayed at his aunt's house in Rocklin, with her son, Amber, and Amber's daughter. Michele and Amber returned to Yuba City, but defendant did not, stating there was a warrant for his arrest. When Michele was questioned by Yuba City police, she lied because she did not want to get into trouble.

M.M., 18 at the time of trial, was born in November 1991, and defendant is her mother's brother. When she was 10, at her grandmother's house on Park Avenue, defendant unzipped her

5

sweater and pants when she was sleeping, and touched her breasts. M.M. reported this to her school counselor the next day, and was taken to the police and then placed in foster care for a year. When she was 12, M.M. was returned home, and when she was 13, defendant again abused her. The first time, when she was sleeping, defendant rubbed her vagina and when she said to stop, he offered her marijuana. Then, for about a three-year period, until about "a week before he got locked up" defendant had intercourse with M.M. many times, and when she was about 15, and high on Ecstasy he gave her, defendant sodomized her. He put his mouth on her vagina and made her suck his penis many times when she was aged 13-16. He also put fingers in her vagina. Defendant offered her alcohol, and when she was only 10 offered her candy to "let him touch my boobs." M.M. had previously denied defendant had anal sex with her because she was embarrassed.

Myrna testified she was born in October 1988 and was 16 in June 2005, while in foster care with Michele S., defendant's girlfriend. One night, defendant pulled Myrna onto a swing bed on the porch, got on top of her, and ignored her protests until Michele came out. Myrna was adamant they had not had intercourse, even after being shown a contrary police report. But a peace officer testified that on June 11, 2005, Myrna reported forcible intercourse, stating "she was orally copulated and that there was actual sexual intercourse with penetration[.]"

Jessica F. testified that on August 4, 2002, when she was 17, she met defendant (younger than she was, but bigger) at church and he offered to take her to a party after he changed clothes at his house. They were kissing, but then he started touching her vagina under her pants (over her underwear) and touching her breasts, kissed her thighs "and was going up" and rubbed his still-clothed penis against her vagina, all the while ignoring her requests to stop until someone knocked on the door. Jessica was scared. He kept ignoring her when she told him to stop. When she tried to leave, he pushed her on the bed, but she was able to run away. She gave a statement to a police officer "a couple days to a week" later.

6

T.W. testified she worked with defendant at a Kirby vacuum distributorship in 2007. At one point, while walking on a road in Yuba City, defendant asked her to have sex with him, and after she declined, he suggested they "could just have anal sex." When T.W. again refused, defendant grabbed her, and, in her words, pulled her "into the carport with his arm around my neck, and pushed me up against the wall, pulled my pants down, and proceeded to have anal sex with me." On other occasions, T.W. had consensual intercourse with defendant. Once in a passenger van with other employees, T.W. orally copulated another coworker, but rebuffed defendant. When T.W. moved to the front of the van and told the driver defendant had been bothering her, he grabbed her hair and said she was "not going to embarrass him like that" and they fought; after the driver pulled over, defendant yelled at T.W. and threatened to kill her after she spat in his face. T.W. was impeached with a felony conviction, and she was still on parole for a theft-related offense.

C.D., aged 23 at trial, testified she knew defendant through a school program around 2000 or 2001. Once in the library, defendant grabbed one or both of her breasts over her clothes, and poked her breast with a pen, using the word "deflate." She repeatedly told him to stop, but he did not stop, and called her a "bitch" and "gutter slut." This happened when she was 14, and defendant was about the same age.

*Defendant's Testimony*

Defendant testified and denied any sexual contact with C., and denied the forcible uncharged act evidence, although he admitted T.W. was hitting him during the van incident, after she tried to kiss him after sucking his penis and another man's penis in the van. He denied he asked Michele or Amber to lie to the police, and denied he had been hiding from the police when he went to Rocklin in 2007. He admitted that Michele walked into the bedroom once while C. was rubbing his back, but he did not remember being covered by a blanket.

7

**DISCUSSION**

**I**

*Sufficiency of the Evidence*

Because C. had passed her tenth birthday (but had not yet reached her eleventh birthday) when he first sodomized her, defendant contends no substantial evidence supports Count 2, sodomy of a child by a person over 18, with "a child who is 10 years of age or younger."[9] (Pen. Code, § 288.7, subd. (a).)

Our Supreme Court recently resolved this issue adversely to defendant, construing the phrase "10 years of age or younger" as used in section 288.7 to refer to a child who has not yet reached his or her 11th birthday. (*People v. Cornett* (2012) 53 Cal.4th 1261.) Accordingly, we must reject defendant's contention. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

**II**

*Uncharged Act Evidence*

Defendant contends the trial court abused its discretion by permitting the People to introduce evidence of uncharged sexual offenses. We are not persuaded.

*A.    Background*

The People moved in limine to introduce evidence that defendant had molested several other girls while they were between the ages of 10 and 17, and had forced himself on two adult women he had dated, to show his sexual attraction to young girls and his propensity to commit

---

[9] Defendant did not object to the pattern instruction stating in part: "Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun." (CALCRIM No. 1127.) However, "A challenge to the sufficiency of evidence is forfeited in the trial court only by failure to file timely notice of appeal." (*People v. Galindo* (2006) 142 Cal.App.4th 531, 538.) Therefore his claim is preserved.

Defendant does not challenge Count 3, oral copulation or sexual penetration of a child "10 years of age or younger" (Pen. Code, § 288.7, subd. (b)), which alleged conduct occurring in the same time period as Count 2. Nor does defendant argue that the evidence that he actually *committed* the charged acts from either count is insufficient--only that the evidence of C.'s age was insufficient as to Count 2.

sexual offenses, under the authority of sections 1101(b) and 1108. Defendant contended the evidence was irrelevant and was unduly prejudicial under Evidence Code section 352 (§ 352). Defendant also objected that although some police reports had been disclosed, there were no declarations setting forth the proposed testimony, and he sought a hearing (Evid. Code, § 402 (§ 402)) to assess that evidence.

The trial court admitted all the incidents under section 1108, and some under section 1101(b).[10]

The People later filed a supplemental motion to introduce evidence of uncharged acts against T.W., an additional adult victim. The motion was granted under both sections 1101(b) and 1108.[11]

The jury was instructed on the limited purposes for which the uncharged act evidence could be used.[12]

In argument, the prosecutor first described in detail why the jury should find C.'s testimony credible, pointing to her demeanor and lack of motive to lie, and described various pieces of corroborating evidence. The prosecutor then argued the relevance and probative value of the uncharged act evidence, to show defendant's propensity to commit sexual offenses, and

_____

[10] Although the motion was granted in part as to alleged uncharged victim D.O., and she appears on the People's final witness list, she did not testify at trial. Therefore, defendant's discussion of her proposed testimony and the ruling admitting it avails him naught.

[11] When the in limine motions were filed, defendant was facing nine counts. However, before the supplemental motion was granted, the People had filed an amended information reducing the number of counts to four.

We note with disapproval that the People's motions filed in 2009 and 2010 asserted "the only guidance" for interpreting "new" section 1108 was legislative history. Section 1108, enacted in 1995, was far from "new," and many cases decided before 2009, including cases from this court, provide guidance in its application. (E.g., *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*); *People v. Fitch* (1997) 55 Cal.App.4th 172 (*Fitch*).)

[12] The jury was instructed that the "sexual battery" of Amber, M.M., Myrna, and T.W. could show intent, motive, common plan, and opportunity, and all the evidence could show defendant was disposed to commit sexual offenses.

also (as to Amber, M.M., Myrna and T.W.) to show his intent (sexual interest in young girls) and common plan (preying on vulnerable victims, using threats and bribes, predilection for anal intercourse). The prosecutor argued none of the uncharged victims had a motive to lie, and their testimony corroborated C.

Defense counsel argued in part that the prosecutor was unfairly piling on, by introducing evidence about uncharged acts, and that C. was not credible, pointing to inconsistencies in her testimony; counsel also emphasized the People's high standard of proof.

### B. *Procedural Claims*

### 1. *Failure to Exercise Discretion*

Defendant first makes the procedural argument that the trial court did not apply the correct standards in making its section 352 ruling because in its comments on the record "the court seemed totally focused upon whether the uncharged act[s] had any similar characteristics to the charged offenses" but did not explicitly discuss other relevant factors such as the cumulative nature of the evidence. We disagree.

Section 352 provides in full: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The two crucial components of section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*Harris*, *supra*, 60 Cal.App.4th at p. 736.) The trial court should consider the possible inflammatory nature of the proffered evidence, the likelihood it will confuse the jury and distract it from the pleaded issues, the remoteness of the evidence, the trial time it will consume, and its probative value. (See, e.g., *id*. at pp. 737-741.)

Defendant is correct that the trial court focused on similarities between the charged and uncharged offenses. But, as defendant acknowledges "Although the record must 'affirmatively

10

show that the trial court weighed prejudice against probative value' [citation], the necessary showing can be inferred from the record despite the absence of an express statement by the trial court." (*People v. Prince* (2007) 40 Cal.4th 1179, 1237; see *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274-1275 (*Hollie*).)

Similarity between the charged and uncharged offenses is considered the "'principal factor affecting the probative value of an uncharged act[.]'" (*Hollie, supra,* 180 Cal.App.4th at p. 1274.) That does not mean the trial court failed to consider *other* appropriate factors. The prosecutor's in limine motions and the defense opposition discussed section 352 and cases interpreting it and we presume the trial court read those filings, and understood the appropriate factors to consider. (See *People v. Gunder* (2007) 151 Cal.App.4th 412, 416.)

> 2.  *Section 402 Hearing*

Defendant buries a procedural argument within his attack on the merits of the trial court's decision: He contends the trial court could not properly evaluate the proposed uncharged act evidence without conducting a hearing outside the presence of the jury (see § 402) to evaluate the proposed testimony. We deem this argument forfeited both because it is not properly headed (see *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 (*Roscoe*)) and because defendant cites no authority requiring such a hearing (see *People v. Anderson* (2007) 152 Cal.App.4th 919, 929). Further, defendant has not explained how the purported error caused prejudice, and concedes the prosecution summary "was essentially consistent" with the trial testimony. Absent an explicit argument explaining prejudice, we are under no obligation to address the claim of error. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11; *People v. Coley* (1997) 52 Cal.App.4th 964, 972; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)[13]

_____

[13] Even more deeply buried in a footnote, defendant appears to argue the trial court mistakenly thought defense counsel had not requested a section 402 hearing. Any such argument is also forfeited, for the reasons stated directly above.

## C. Substantive Claims

Defendant next contends the trial court abused its discretion on the merits. We find no error.

In his briefing, defendant complains about "uncharged act" evidence, but he does not separately analyze section 1108 and section 1101(b). He argues the trial court misapplied section 352, and discusses the prejudice from and only from "propensity" (§ 1108) evidence. Absent coherent argument, we need not separately address the trial court's section 1101(b) analysis.[14] (See *Roscoe*, *supra*, 169 Cal.App.4th at p. 840.)

Defendant asserts generally that the uncharged act evidence portrayed him as a "sex offending maniac with the propensity to commit any sexual offenses at all." However, as we have observed before, in a case discussing section 1108, "Painting a person faithfully is not, of itself, unfair." (*Harris*, *supra*, 60 Cal.App.4th at p. 737.) The uncharged act evidence showed defendant had a strong disposition to sexually victimize girls and young women, and had done so for years.

Although not structured as an attack on the validity of section 1108, in effect defendant's brief quarrels with the legislative judgment in enacting that statute. This case fits *squarely* within the legislative purpose of section 1108; we have previously described that purpose as follows: "Evidence of a prior sexual offense is indisputably relevant in a prosecution for another sexual offense. 'In the determination of probabilities of guilt, evidence of character is relevant.'" (*Fitch*, *supra*, 55 Cal.App.4th at p. 179.) "Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such

_____

[14] We note that only the "least degree of similarity between an uncharged act and a charged offense is required to prove intent." (*People v. Escudero* (2010) 183 Cal.App.4th 302, 313-314 (*Escudero*).) And, "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) Intent and common plan were the main theories argued by the prosecutor regarding 1101(b).

evidence.[fn.] The Legislature has determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial." (*Id*. at pp. 181-182.)

"Consistent with common experience, the Legislature has found that persons who commit sex offenses often have a propensity to commit sex crimes against more than one victim. . . . Thus, [section 1108] evidence is *presumed to be admissible* to assist the trier of fact 'in evaluating the victim's and the defendant's credibility.'" (*Escudero*, *supra*, 183 Cal.App.4th at pp. 305-306, emphasis added.) Further:

> "By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is *substantially outweighed* by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (Evid. Code, § 352.) This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence. [Citation.] With this check upon the admission of evidence of uncharged sex offenses in prosecutions for sex crimes," section 1108 satisfies due process. (*Fitch*, *supra*, 55 Cal.App.4th at p. 183, emphasis added.)

Defendant acknowledges, as he must, that the jury was properly instructed on the limited purposes for which the uncharged act evidence was admitted. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; see *People v. Zack* (1986) 184 Cal.App.3d 409, 416.) The instructions in this case described each uncharged victim, and specified whether her testimony had been admitted pursuant to section 1108 or section 1101(b) or both, and explained the permissible uses of such evidence, and all of the uncharged acts were described in the instructions as "sexual battery[.]"

This answers defendant's concern that the jury would seek to punish him in this case for the uncharged acts, speculating that he had not yet been prosecuted for them: "Upon review of the arguments of counsel and the jury instructions, we are persuaded that the jury was not inclined to improperly punish defendant for the uncharged acts. The jury was given an effective

instruction by the trial court to consider the evidence only for proper limited purposes, and we must presume the jury adhered to the admonitions." (*Hollie*, *supra*, 180 Cal.App.4th at p. 1277.)

None of the uncharged act evidence was confusing. Nor was the evidence inflammatory in comparison with evidence of the charged offenses, describing multiple forcible sodomies and other sexual abuses of a girl beginning when she was just nine years old. None of the uncharged acts were qualitatively "worse" than the *charged* acts. This sharply distinguishes defendant's case from *Harris*, *supra*, 60 Cal.App.4th 727, where the *uncharged* acts depicted horrific sexual violence, which we characterized as "inflammatory *in the extreme*" and the *charged* acts involved "breach of trust by a caregiver" consisting of sexual fondling and licking. (*Id.* at pp. 731-735, 738.)

The uncharged act evidence did consume a great deal of trial time. However, although another judge might have required the People to pare down the presentation of the uncharged evidence, we cannot say the evidence was *so* time-consuming that it dwarfed the charged evidence, thereby distracting the jury from its central purpose, or that this one factor shows the trial court abused its discretion. Again, we find there was no "'substantial likelihood the jury [would] use [the propensity evidence] for an illegitimate purpose.'" (*Escudero*, *supra*, 183 Cal.App.4th at p. 310.)

The fact some of the uncharged victims were adults at the time of the alleged conduct, whereas the charged victim was a young girl, did not render the evidence irrelevant. (*Escudero*, *supra*, 183 Cal.App.4th at pp. 310-311.) Nor was the evidence remote, particularly because the evidence showed a continuous pattern of abuse, with no intervening gap between the charged and uncharged acts. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285.)

In short, we find no abuse of discretion in the trial court's decision to permit the prosecution to introduce uncharged act evidence in this case.

III

*New Trial Motion*

Defendant contends the trial court erred by denying his motion for a new trial based on juror misconduct.  We disagree with this contention.

*A.    Background*

The jury returned its verdicts on August 6, 2010.

On October 25, 2010, defendant moved for a new trial based in part on a juror's improper receipt of information outside the courtroom, and supported the motion with a transcript of an earlier hearing and several declarations.[15]

The transcript, dated Tuesday, July 27, 2010, shows that before opening statements had begun, Juror 335686 advised the bailiff of an ex parte communication the juror had received about the trial over the weekend.[16]  The juror reported that on Saturday, while building a fence with a man, the juror told the man he would not be able to work the next week because he was a juror.  The man asked what trial it was and the juror said he could not talk about it.  In response, the man said, "'Well, I hope it's not that child molest case.'"  Although the juror repeated that he could not discuss the case, the man persisted and told the juror defendant was guilty, and had been offered nine years but had not accepted.  The fence-builder was going with the juror to a meeting, where "Thomas" would be present, but the juror told the man he did not want to meet Thomas and, "'Just hush up.'"  The juror assured the trial court he could put this out of his mind and the trial court and both counsel were satisfied.  The trial court also noted that in about 10 minutes, the prosecutor would also tell the juror defendant was guilty, that is, during the opening statement to the jury.

_____

[15]  The other grounds of the new trial motion are not relevant.

[16]  The trial was conducted Tuesdays through Fridays, thus the jury did not convene on Monday, July 26, 2010.

The declarations submitted in support of the new trial motion were, as the People argued, replete "with innuendo, but no evidence of misconduct." We explain in detail.[17]

Defendant's supporting declaration stated that his "family advised" him that his mother's ex-husband Thomas Silvera was in the courtroom during the trial "and he in fact was the person who had talked to the juror while building a fence." This was sheer hearsay. Defendant also declared that Silvera had accused him of misconduct in the past and was prejudiced against him "and I believe" Silvera contacted the juror to prejudice the case. That Silvera accused defendant in the past was a factual claim, but defendant's *belief* that Silvera tried to prejudice the jury was not.

Defendant's mother's supporting declaration stated "It was told to" her that Silvera was the man who had spoken to the juror. This was hearsay. She also declared that Silvera "hates my son and I believe he would do anything in his power to influence the jury and prejudice them against my son." The fact Silvera hated defendant may have been within defendant's mother's knowledge, but her stated belief that Silvera would try to prejudice the jury was not factual, as no foundation for such belief was stated in the declaration.

Defendant's brother's supporting declaration states that at one point during the trial he saw Silvera speaking to Juror 7, but he could not hear what was said.[18] Defendant's brother also declared that "Later on" Silvera spoke to defendant's mother "and told her if my brother is found not guilty he was going to press charges for one of his kids. I overheard the conversation." However, defendant's mother's declaration says nothing about this conversation, and she would have been the best person to corroborate it.

No declaration by Silvera was provided.

---

[17] The briefing does not accurately summarize the declarations, and confuses their contents.

[18] The parties agree in their briefs that Juror 7 was the same as Juror 335686. We accept that view.

Finally, a jail inmate's supporting declaration stated he had been at a bar "in early September"--*after* the verdicts--and that Silvera and another man were talking about the case with a person who identified himself as a juror. The inmate claimed to "know" that Silvera hated defendant.

The trial court denied the new trial motion, because the juror promptly and voluntarily reported the initial ex parte contact, indicated he could be fair, and both counsel accepted the juror's statement. The juror did not receive *evidence* about defendant's guilt, only the opinion he was guilty. The fact the juror spoke to Silvera *after* the verdict was not improper. Silvera was not a proposed witness, therefore "there was no prohibition on the juror talking to him, especially if he knew him as a friend. There's no reason to believe they discussed this case, or if they did discuss the case, there's no reason to believe that the discussion was anything more than what the information was at the outset which we determined was the juror said he could remain fair and impartial and only base his decision on the evidence in court. [¶] This court can't help but think that if, in fact, this juror was in collusion with Mr. Silvera and somebody else to subvert the integrity of the jury system and to find Mr. Renshaw guilty regardless of the evidence, then it makes no sense that that juror would have voluntarily brought this contact to the court's attention."

### B.  Analysis

A new trial may be warranted where a juror "has received any evidence out of court[.]" (Pen. Code, § 1181, subd. 2.)  Generally, any form of jury misconduct "gives rise to a presumption of prejudice, which 'may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.'"  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425; see *People v. Ryner* (1985) 164 Cal.App.3d 1075, 1082.)

When a trial court denies a criminal defendant's motion for a new trial due to juror misconduct, "We accept the trial court's credibility determinations and findings on questions of

historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (*Nesler*).)[19]

Before directly addressing defendant's appellate claims, we point out that the trial court could rationally reject all of the facts stated in the supporting declarations. "Provided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted." (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660.)

But *even if* the trial court credited the admissible (and even arguably admissible) evidence in the declarations, the showing was anemic, at best: Defendant's declaration was based on what he was told by his family and his belief, except to the extent it showed Silvera had accused him of misconduct. Defendant's mother's declaration was also based on what she was told and her belief, except to the extent it showed her ex-husband Silvera hated defendant. Defendant's brother's declaration said he saw Silvera speak to the juror but he had no idea what was said. He claimed Silvera later told his mother that if defendant were to be acquitted, Silvera would press charges against defendant on behalf of Silvera's child.[20] The sum of all the declarations about pre-verdict conduct was that Silvera hated defendant, had accused him of misconduct in the past, vowed to seek justice for his own child if defendant were acquitted, and at some point during trial conversed with the juror. The rest was speculation.

The inmate's declaration merely showed that *after the verdicts*, the juror spoke with Silvera, and corroborated the fact that Silvera hated defendant.

There are two distinct ways to analyze possible bias flowing from a juror's receipt of outside information:

_____

[19] However, when a trial court *grants* a new trial based on juror misconduct, we review the prejudice finding for an abuse of discretion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1255.)

[20] As noted earlier, defendant's mother, a party to this alleged conversation, said nothing about it in *her* declaration.

"When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. . . . Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler*, *supra*, 16 Cal.4th at pp. 578-579.)

Defendant's briefing does not clearly differentiate between these two tests for bias. We consider them separately.

The first test is whether "the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror[.]" (*Nesler*, *supra*, 16 Cal.4th at pp. 578-579.)

Defendant *speculates* about what Silvera may have said to the juror, but the only *evidence in the record* about what the juror actually heard before deliberations was the evidence the juror volunteered before opening statements, about the conversation he had over the weekend. Even if that person was Silvera, all that was said was that the person believed defendant was guilty, and that defendant had declined a nine-year plea offer. The juror assured the trial court he could put this out of his mind. The trial court, observing his demeanor, accepted the juror's assurance, and neither counsel objected.

In such circumstances, the trial court did not err in concluding the presumption of prejudice was dispelled. During the death penalty phase of a capital trial, a juror heard a news report that the defendant had threatened the guards if he were to receive the death penalty. The juror promptly reported what he had heard, and after stating that he would disregard what he had heard and not share it with the other jurors, was kept on the jury. (*People v. Zapien* (1993) 4 Cal.4th 929, 993-994 (*Zapien*).) The court held the presumption of prejudice was dispelled: "Juror Schwark informed the trial court at the earliest opportunity that he inadvertently had received information concerning the case. The trial court held a hearing, outside the presence of the other jurors, at which Schwark pledged he would not divulge this information to his fellow jurors and would disregard it in performing his duties as a juror. In his opinion, he still could be

19

fair and impartial. The trial court, which had the benefit of observing Schwark's demeanor, stated it believed him. According proper deference to this finding, we uphold the ruling of the trial court, concluding that the record rebuts the presumption of prejudice and that there is no substantial likelihood the incident prejudiced defendant." (*Id*. at p. 994.)

Here, too, after the juror volunteered information about extraneous information, the juror assured the trial court he could disregard the information, and we presume the juror did so. (*Zapien*, *supra*, 4 Cal.4th at p. 996; *People v. Craig* (1978) 86 Cal.App.3d 905, 919-920; cf. *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1114-1115, 1118, 1120-1122 [court would not presume juror followed instructions where the juror engaged in daily ("pervasive") conversations with a friend about "deliberative-type" issues, such as whether the alleged victim had a motive to lie, and why Cissna had not testified].)

The second test for juror bias is whether "even if the information is not 'inherently' prejudicial . . . from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler*, *supra*, 16 Cal.4th at p. 579.)

In *Nesler*, the offending juror "sat in a bar while a woman revealed damaging information about [Nesler] for half an hour" and the juror revealed the information "at a time when she disagreed with other jurors, in an apparent attempt to persuade them to change their views." (*Nesler*, *supra*, 16 Cal.4th at p. 579.) *Nesler* therefore was not a case of "inadvertent" receipt of information by a juror, although even inadvertent receipt of outside information by a juror is deemed misconduct. (*Id*. at pp. 579-580.) The claim in *Nesler* was that the juror's conduct reflected *actual bias* by the juror, and that claim was sustained based on the evidence in the record. (*Id*. at pp. 580, 583-589.)

In contrast to *Nesler*, and as stated above, in this case there is no evidence about what, if anything, Silvera said to the juror except for the juror's volunteered information before opening statements. Assuming it was Silvera who spoke to the juror over the prior weekend, all he said was that he thought defendant was guilty and that defendant had rejected a plea offer. That does

not show any likelihood the *juror* was actually biased against defendant, even if Silvera hated defendant. Nor is it significant (assuming these are the facts) that the juror spoke to Silvera during a break in the trial, and spoke to him in a bar the month after the verdicts were rendered. As the trial court found, there was no legal prohibition on a juror's speaking with Silvera generally, because he was not a witness, and there was no evidence any such conversation was about the trial. Further, as the trial court observed, the idea that the juror would be in cahoots with Silvera to throw the trial, after the juror had *volunteered* information about the inadvertent ex parte contact he had had before opening statements, makes no sense.

Defendant's speculation about the alleged *post-verdict* contacts with the juror is irrelevant, as such contact by definition could not have affected the verdicts.

In short, defendant's motion did not compel the trial court to grant a new trial based on juror misconduct. Prejudice from the inadvertent pretrial misconduct was dispelled by the trial court's admonition, and no further misconduct was proven.

## DISPOSITION

The judgment is affirmed.

DUARTE , J.

We concur:

RAYE , P. J.

BLEASE , J.

21