Filed 10/15/14  P. v. Mitchell CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| THE PEOPLE, | C068664 |
| Plaintiff and Respondent, | (Super. Ct. No. P09CRF0064) |
| v. | |
| KELLY C. MITCHELL, | |
| Defendant and Appellant. | |

Defendant Kelly C. Mitchell appeals following conviction on 11 counts of sex offenses against three minors.  (Pen. Code, §§ 288, subd. (a), 288, subd. (c)(1), and 288.5[1].)  Two of the victims are daughters of defendant's cohabitant girlfriend; the third victim is defendant's own biological daughter from a different relationship.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's crimes.

On appeal, defendant contends (1) the trial court abused its discretion in admitting evidence of uncharged sexual misconduct; (2) his "one strike" sentence (§ 667.61) as to counts related to one of the victims was improper because there was no finding that any of the acts alleged to have occurred between August 1, 1994, and August 31, 2001, were committed after the date the law took effect on November 30, 1994; (3) the trial court overcharged him $40 for court security fees (§ 1465.8), an issue he acknowledges is rendered moot by the trial court's issuance of an amended abstract of judgment, and (4) the trial court shortchanged him on presentence credits (§§ 4019, 2933.1).

We order correction of the presentence credits and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

An information charged defendant with six counts of lewd and lascivious acts upon a child under age 14, four counts of lewd and lascivious acts upon a child age 14 by a person at least 10 years older than the child, and continuous sexual abuse of child under age 14. Jane Does 1 and 2 are the daughters of defendant's girlfriend/fiancée. Jane Doe 3 is defendant's biological daughter by another relationship.

Specifically, the pleading alleged:

**Count 1:** Lewd act upon Jane Doe 1, a child under age 14, between October 1 and October 31, 2006 (§ 288, subd. (a));

**Count 2:** Continuous sexual abuse of Jane Doe 1, a child under age 14, between November 2006 and November 3, 2008 (§ 288.5), by engaging in "three and [*sic*] more acts" of "substantial sexual conduct" (§ 1203.066, subd. (b)) and "three and [*sic*] more acts" in violation of section 288, while the defendant resided with and had recurring access to the child;

**Count 3:** Lewd acts upon Jane Doe 1, then age 14 and at least 10 years younger than defendant, between November 4, 2008, and January 31, 2009 (§ 288, subd. (c)(1));

2

**Count 4:** Lewd acts upon Jane Doe 1, then age 14 and at least 10 years younger than defendant between November 4, 2008 and January 31, 2009 (§ 288, subd. (c)(1));

**Count 5:** Lewd acts upon Jane Doe 2, a child under age 14, between August 1, 2006, and September 22, 2007 (§ 288, subd. (a));

**Count 6:** Lewd acts upon Jane Doe 2, a child under age 14, between August 1, 2006 and September 22, 2007 (§ 288, subd. (a));

**Count 7:** Lewd acts upon Jane Doe 2, then age 14 and at least 10 years younger than defendant, between September 23, 2007, and June 1, 2008 (§ 288, subd. (c)(1));

**Count 8:** Lewd acts upon Jane Doe 2, then age 14 and at least 10 years younger than defendant, between September 23, 2007, and June 1, 2008 (§ 288, subd. (c)(1));

**Count 9:** Lewd acts upon Jane Doe 3, a child under age 14, between August 1, 1994, and August 31, 2001 (§ 288, subd. (a));

**Count 10:** Lewd acts upon Jane Doe 3, a child under age 14, between August 1, 1994, and August 31, 2001 (§ 288, subd. (a)); and

**Count 11:** Lewd acts upon Jane Doe 3, a child under age 14, between August 1, 1994, and August 31, 2001 (§ 288, subd. (a)).

The pleading also alleged multiple victims for sentencing purposes under section 667.61, subdivisions (b), (c), and (e).

The offenses occurred in El Dorado County, except the offenses concerning Jane Doe 3, which occurred in Sacramento and were joined in this El Dorado County prosecution pursuant to section 784.7, subdivision (a).

3

**Evidence Code Section 1108 In Limine Motion**

The prosecutor moved in limine to admit evidence under Evidence Code section 1108[2] of prior sexual offenses defendant committed against four young girls (Jane Does 4 through 7) while in Utah.  Specifically, the prosecutor sought to admit evidence that:

(1)  Defendant fondled the breasts and vagina of  his step-niece, Jane Doe 4, between 1974 and 1980, when she was seven or eight until she was 15 years old, and penetrated her vagina with his finger when she was 12 or 13;

(2)  In 1980, defendant rubbed the vagina of 14-year-old Jane Doe 5;

(3)  In 1982, defendant stroked the outside of the vagina of his nine-year-old niece, Jane Doe 6; and

(4)  In 2001, he put his penis in the vagina of his 14-year-old niece, Jane Doe 7.

Defense counsel opposed the motion in limine, on the grounds the evidence was remote, inflammatory, and so prejudicial as to render the trial fundamentally unfair in violation of due process.  Defense counsel argued the "biggest concern" was the remoteness of three out of the four uncharged incidents.

The trial court ruled the evidence admissible.  The court said Evidence Code section 1108 clearly allowed it, and the question was whether it should be excluded under Evidence Code section 352.  The court said, "What I note is that the conduct that is alleged in the Complaint and the conduct that is purportedly alleged by these [Evidence Code section] 1101 [*sic*] witnesses is almost identical:  Family members or close friends. The time period is not even that far off.  This is a 1993 [*sic*, 1994].  2001, the current

---

[2]  Evidence Code section 1108 provides in pertinent part:  "(a) In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101 [character evidence inadmissible to prove conduct on specific occasion], if the evidence is not inadmissible pursuant to Section 352 [trial court may exclude evidence if its probative value is substantially outweighed by danger of undue prejudice, undue consumption of time, confusion of issues or misleading jury]."

matter.  [¶]…[¶]  And so it appears to me that where the issue is identification and the Defendant's disposition to commit these sorts of crimes, that the jury is entitled to hear this information, and I'm going to allow the Doe witnesses to present their testimony under 1108."

**Prosecution Trial Evidence Regarding Jane Does 1 and 2**

Jane Doe 1 (born November 1994) and Jane Doe 2 (born September 1993) are the daughters of defendant's live-in girlfriend/fiancée, K.B.  In 2006, defendant, who was born in 1960, moved into K.B.'s home with her, her two daughters, and her three sons. K.B. had a full time job from 7:00 a.m. to 3:30 p.m.  Defendant did not have a job.  He worked from home, selling Hot Wheels and used motorcycle parts on eBay.

Jane Doe 1, age 16 at the time of trial, testified that one night in October 2006, when Jane Does 1 and 2 were ages 11 and 12, defendant became very drunk.  K.B. and the children had all gone to bed.  Jane Doe 1 testified that defendant came into her bedroom, removed her pants, touched her breasts and vagina, and put his mouth on her vagina.  Defendant sat between her legs and inserted something into her vagina, which began to hurt.  She kept her eyes shut, hoping he would stop.  He replaced her pants, said he loved her, and left the room.  The next day, he did not act differently toward her.  She did not tell anyone at the time, because she was trying to pretend it did not happen.  After that night, defendant routinely touched Jane Doe 1's breasts, vagina and buttocks, both over and under her clothing, when they were alone or in the presence of her siblings, almost daily until he stopped living there.  She tried to tell him to stop, but he ignored her.  She told her sister, who said defendant did the same thing to her.  Jane Doe 1 once saw defendant grab her sister Jane Doe 2's "boob" and "butt."  Jane Doe 1 did not tell her mother because she did not want to ruin her mother's happiness.  She felt her mother

5

would pick her boyfriend over her daughter.[3] And she would not have told Children's Protective Services (CPS) what defendant was doing, because she was afraid CPS would take her away from her mother, as they did once in Utah because the home was not clean.

Jane Doe 2, age 17 at the time of trial, testified defendant touched her breasts and vagina and rubbed her vagina with his finger, both over and under her clothing. She remembered defendant touching her one night when he had been drinking. He continued to touch her on a regular basis, despite her asking him to stop. She told her mother, who called her a liar. The abuse stopped when she moved to Utah to live with her father in 2008.

In 2009, Jane Doe 1 disclosed the abuse to her mother's friend, Cristin Geil, who was staying with them. Geil testified that Jane Doe 1 said she and her sister had told their mother, who told them to give defendant another chance. Geil did not talk to K.B. about what Jane Doe 1 had said because K.B. had not been responsive to Jane Doe 1's earlier complaint. Instead, Geil contacted the police.

The police asked K.B. to bring Jane Doe 1 to the police station, where Jane Doe 1 told a detective about the abuse. The detective testified that, when he told the mother what the daughter had said, she seemed devastated. As if "a light bulb went off" in her head, she interrupted him and recalled an incident about two years earlier when defendant had come to bed extremely intoxicated and told her he had done terrible things and did not deserve her.

The victims' brother Robert testified he never saw and never told the police detective that he saw defendant put his hand on either girl's breast as they watched movies. Robert said the girls seemed to love defendant.

---

[3] Jane Doe 1 testified that the fact her mother visited defendant in the jail during the pendency of the case made her feel like her mother believed defendant over her and would rather pick defendant over her own daughter.

Robert's trial testimony was impeached. The detective testified Robert told him that defendant would touch the girls' chest area or "touched over her boob" when one or the other sat on his lap to watch movies. The jury heard an audiotape of the interview. The detective testified that, as Robert made the statement, he demonstrated by touching his own breast area with his hand.

A former resident services coordinator who saw the children regularly for after-school programs testified she noticed a complete change in the children -- from happy to sullen -- after their mother's new boyfriend moved in.[4] In September 2006, the witness called CPS after Jane Doe 2 said her mother's new boyfriend was bathing and dressing her. The witness was not privy to the CPS investigation but contacted CPS again when Jane Doe 2 later told her she had lied to CPS because she did not want to be taken away from her mother and her home. Jane Doe 2 testified she concealed the abuse when questioned by CPS because she did not want to get her mother in trouble.

K.B. testified she did not recall her daughters ever telling her that defendant had touched them inappropriately, and she would remember it if they had done so. Jane Doe 2 may have said she did not want defendant in her bedroom, but the mother would have associated that with the child being headstrong and resenting him when he reprimanded them. The girls otherwise displayed affection toward defendant. K.B. testified she still loved defendant, visited him in jail as often as she could, and still planned to marry him. She admitted she saw pornography on defendant's computer that appeared to be "older teens," but he told her they were underdeveloped adults. On cross-examination, K.B. testified defendant later clarified what he meant when he drunkenly told her she did not know what kind of person he was, what he had done in the past. The

_____

[4] The witness sometimes saw the boyfriend on the second-story deck of the apartment but by the time of trial, she could not identify defendant.

7

trial court sustained the prosecutor's hearsay objection as to how defendant clarified his comments.

The police found several hundred child erotica images without sexual activity on computers seized from the home, as well as files waiting to be downloaded per user request, with titles such as "My daughter's first painful time as I brutally rape her in my truck" and "Teen Incest."

**Prosecution Evidence Regarding Jane Doe 3**

Jane Doe 3 is the daughter of defendant and L.M. Defendant and L.M., had been married, and also had a son, Jane Doe 3's younger brother. L.M. worked during the day. Defendant was not employed and stayed home during the day with Jane Doe 3.

Jane Doe 3, age 17 at the time of trial, testified she was born in November 1993 and last saw defendant when she was seven years old. She remembers incidents that occurred when they lived in an apartment in a Sacramento duplex on Stockton Boulevard. Jane Doe 3's mother, defendant's ex-wife, testified they moved to that duplex when Jane Doe 3 was five years old. Before that, they lived on a ranch and in a trailer.

Jane Doe 3 testified defendant often played pornography on his computer while she was in the room. He showered with her and washed her but sometimes touched her in a sexual way, different from a washing or cleaning touch.[5] A couple of times, he took her into her bedroom, had her lie on the bed, removed her clothes or had her remove them, touched her vagina, put his fingers inside her, and tried to put his penis inside her. It hurt. She cried and tried to tell him to stop but he would not stop. Once in a while he

---

[5] Although Jane Doe 3 recounted the showers as having occurred in the duplex, she also said they occurred when she was three or four years old. Jane Doe 3 also remembered the molestations occurring around the time her brother was a year or two old. According to the mother, they moved to the duplex when Jane Doe 3 was about five years old and the brother was about one month old. Jane Doe 3 remembered having her own bedroom, but her mother testified the duplex had only one bedroom, though defendant usually was not home at night because he was a musician.

8

touched her bottom, and she thought he put his penis in her bottom. She testified she was certain the bedroom incidents happened when she was around four or five years old, not two or six years old. She did not tell her mother because she was scared about what would happen. Because it was hard for Jane Doe 3 to talk about what happened, before trial she wrote down some things she remembered. The prosecutor read them aloud, and Jane Doe 3 testified she wrote them and they are true. Among these items were that defendant "smacked me and hit me when I did something wrong. A lot of the time [he] would hit or smack me in the side of the head…." Also, "The sexual abuse that I remember is him locking me in my room and telling me to lay down on my bed. If I didn't listen he would get mad at me so I had to listen. Then he would tell me to lay down on my stomach and take off my pants. And then [defendant] would get on top of me and try to get his dick inside of me or he would make me bend over on my knees and he would play with me and put his fingers inside of me. And I would cry and try to tell him to stop but he wouldn't."

L.M. testified that she left defendant when Jane Doe 3 was about seven years old, after defendant became angry at their son when he accidentally locked himself in the bathroom, and defendant took a hammer to the door, smashing the boy's hand. In 2001, L.M. obtained a "kick-out" order, and defendant moved back to Utah. A week or two later, L.M. received a phone call from defendant's mother, who suggested having Jane Doe 3 "checked out to make sure she was okay," because defendant had "gotten into trouble and possibly raped Jane Doe 7."[6] L.M. spoke with Jane Doe 3, who disclosed what defendant did to her. L.M. took her daughter to a doctor and obtained counseling for her through their church. L.M. testified she did not call the police, because she called a Children's Protective Services (CPS) hotline and was told she could be "considered

---

[6] The trial court allowed this evidence as going to the state of the mind of the ex-wife, to explain her subsequent actions.

guilty" for failing to protect the child. L.M. did not talk to law enforcement until they approached her as part of the investigation in this case.

## Trial Evidence of Uncharged Sexual Misconduct

Before introducing the uncharged sexual misconduct evidence, the prosecutor told the court that she intended to call not only the victims, but also witnesses who would testify that the victims disclosed the sexual abuse long before defendant was arrested for the current charges. The prosecutor argued that the testimony was relevant to dispel the defense's insinuation of a "witch hunt conspiracy" and would not be time-consuming. The defense argued the evidence was remote and unreliable. The trial court determined the probative value outweighed any prejudicial effect and allowed the fresh complaint evidence regarding the Evidence Code section 1108 witnesses.

### Jane Doe 4

Jane Doe 4 testified she was born in 1966, and when she was about eight years old, her mother married defendant's brother. When she was eight or nine years old, she and defendant, who was then 13, sometimes slept in the yard of his father's house, and defendant kissed her, touched her breasts, put his hand down her pants, and touched her vagina. It happened several times. The first time it happened, defendant was with a friend of his named "Wally," who also molested Jane Doe 4. She then did not see defendant for a while after her stepfather died. Jane Doe 4 saw defendant again when she was 12 or 13, and he was about age 20. Because of problems at home, she sometimes stayed at the home of defendant's sister. Often when she was alone with defendant, he play-wrestled, grabbed her vaginal area outside her clothes, pulled down her shirt, forcibly kissed her, and put his hands in her pants and his fingers inside her vagina. The incidents stopped when she was about 15 and no longer frequented defendant's sister's house.

Jane Doe 4's mother testified that in the late 1980's or early 1990's, Jane Doe 4 told her about being molested years earlier by defendant as well as other molestations by

10

her grandfathers. By that time, Jane Doe 4 was grown and married and her grandfathers were deceased. The mother did not contact law enforcement.

### Jane Doe 5

Jane Doe 5 testified that in 1980, when she was almost 14, her brother-in-law brought defendant into her mother's house in Utah.[7] The two men were accompanied by another male named Wally Duncan. She had been alone in the house before the men arrived. Jane Doe 5 had never previously seen defendant. Defendant immediately approached Jane Doe 5 in the kitchen and started saying derogatory things about his body parts. He told her, "suck my dick. I have a big head," and pushed and smacked her around, pushed her into a bedroom next to the kitchen, pushed her on the bed and smacked her. She screamed for help to her brother-in-law and Wally, who were in the next room in this small house, but they did nothing. Jane Doe 5 said the men "acted like they turned their head." Defendant grabbed her breasts and vagina and was "all over [her]." She hit him with a lamp, and he ran out of the house with her brother-in-law and Wally. She immediately called the police.

### Jane Doe 6

Jane Doe 6, who is defendant's niece and Jane Doe 4's stepsister, testified that in 1982, when she was nine years old, defendant gave her a ride from California to Utah. A few days later, defendant was in his car parked in his mother's driveway when he persuaded her to get in the car. He pulled her pants down and touched her vagina. He stopped when his sister drove up, and quickly left. Jane Doe 6 immediately told the sister what happened and then told defendant's mother, who accused Jane Doe 6 of lying and told her shut up and stop talking about it.

---

[7] Jane Doe 5 was in foster care and visiting her mother's house at the time of this incident.

**Jane Doe 7**

Jane Doe 7 testified that in August 2001, she was 14 and living in Utah with her uncle, who is her father's brother and who previously had been married to defendant's sister. Jane Doe 7 slept on a couch. Defendant, who had just moved to Utah, began staying in a different room at the same home.

One night defendant had come home drunk, stumbled and fell on Jane Doe 7 as she was sleeping on the couch. He asked her to help him to his room and she did so. Once in the room, defendant told her to sit in a chair and asked if she wanted a beer. She accepted and he gave her a beer. While they were sitting in the room, defendant was looking at pornography on his computer. Defendant shut and locked his door and told her to sit with him on the futon. When she did, defendant took off her pants, and raped her. When he took off her pants, she asked to stop, but he did not. He told her not to tell anyone.

The next morning, defendant made comments to Jane Doe 7 like, "Good morning, baby," and "I just want to marry you." Jane Doe 7 left with her friend to go swimming at the trailer park pool. Jane Doe 7 testified that defendant came to the pool and touched Jane Doe 7's friend. Jane Doe 7 left the pool and went to her cousin's house, where she told the cousin and the cousin's friend what had happened the previous night. She was later interviewed by the police. Thereafter, it was not brought up again. She never went to court regarding this event.

The cousin's father is the uncle with whom Jane Doe 7 was staying. Defendant is the brother of the cousin's father. The cousin testified that on a date not too long after defendant arrived in Utah from California, while defendant was living with her father and Jane Doe 7 she picked up Jane Doe 7 at the pool. Jane Doe 7 told her defendant was sticking his hands in her swimming suit. When the cousin said she was going to tell her father, Jane Doe 7 said she had something else to tell her. Jane Doe 7 started to shake,

12

tremble, and cry and told the cousin defendant had sex with her the previous night. The cousin immediately called the police.

Before the police arrived, the cousin told her father. Around that time, defendant rode up on his bike. The cousin and the cousin's father then confronted defendant, who denied it. He then took off on his bike and never returned. He left his belongings at the cousin's father's house, and the cousin did not see defendant until "years later."

The cousin's friend testified that he saw defendant groping Jane Doe 7's breasts at the pool. Later that day, he had a conversation with her. She was visibly shaken and did not really want to talk. He asked her what had happened and she told him that the night before she had been sleeping on the couch, defendant tripped and landed on top of her. She woke up and he offered her a cigarette. She said defendant told her that if she wanted a cigarette, she would have to come into defendant's room. After they went into the room, defendant gave her a cigarette and then took nude photos of her with his webcam and refused to take the photos off his computer because he was going to sell them on the Internet. She also said defendant raped her.

**Defense Evidence**

Defendant testified. Regarding Jane Does 1 and 2, he denied any inappropriate touching. He said sometimes one of the girls sat on his knee as they watched movies, and he held her with his arm around her. He said they made up their story because they wanted him out of the house because he disciplined them when they did something wrong. He was strict, and their mother was lenient.

Defendant said he got very drunk one night and slept in his own vomit. He told Kellie what a bad person he was, and that he had done some terrible things in his past. He was just having a "pity party" because he is not successful, and Kellie is a special lady. He was not referring to raping young girls or anything specific, other than "like with my problems with -- like with Carolyn," a former girlfriend whose drug use and mental instability caused him to hit her and be convicted for domestic violence.

13

Defendant said Cristin Geil, the houseguest who reported the molestation, lied on the witness stand. He disliked her and had a dispute with her, because she ran up the electric bill and would not help pay it.

Regarding his daughter, Jane Doe 3, defendant denied any inappropriate touching or exposing her to pornography. He sometimes showered with her in order to wash her. There was no bathtub in the house, just a shower. He guessed Jane Doe 3's accusations were instigated by her mother, who hated defendant because the child liked him better than the mother.

Defendant admitted looking at pornographic pictures on his computer of girls that appeared to look underage when living with K.B. and Jane Doe 1 and 2, but he said they did "not really" arouse him sexually. He said pornography did not excite him sexually. When asked, "no or not really? Which one is it?" he said, "No."

Defendant denied all of the uncharged sexual misconduct. Regarding Jane Doe 4, defendant had no interest in her and only remembered sleeping outside with her brother, not with her. Defendant called Jane Doe 5 " 'the crazy one.' " He said he had met her at Wally's house and did not like her because she was "cocky, mouthy." All he did was say something "very derogatory" to her, because he disliked her, and she "went psycho" and began screaming, so he left. He said he did not remember exactly what he said to her. At one point he described what he said to her as "lewd comments." At another point he testified he said something about "[h]ow big she was, or something like that." Regarding Jane Doe 6, defendant did not remember driving her between California and Utah, and he said the driveway molestation she described "[n]ever happened." Regarding Jane Doe 7, defendant testified she came into his room for a cigarette, drank a beer, and "That was the end of that." When asked why all these people from Utah would come and testify against him, defendant said his family in Utah dislike him and have a way of getting other people to say " 'Hey,' whatever." He admitted it had been 23 years since he last saw any of these people from Utah.

14

While defendant denied misconduct with any of the Does (except for making lewd comments to Jane Doe 5) and insisted the witnesses were lying or confused, some of his answers on cross-examination were telling, such as:

"Q. When is the last time you drank?

"A. The night that I got sick and threw up and slept in my own puke.

"Q. The night that [Jane Doe 1] was raped?

"A. I don't know if that's the night or not."

[¶]…[¶]

"Q. Well, weren't you drinking the night that [Jane Doe 7] was raped?

"A. Yeah.

"Q. Okay. And you were drinking when you were over and attacked [Jane Doe 5], correct?

"A. No.

"Q. You weren't drinking that day there with Wally?

"A. No.

"Q. No?

"A. No.

"Q. So you weren't talking about what you had just done that night when you were apologizing to Kellie; is that what you're saying today?

"A. That's what I'm saying."

[¶]…[¶]

"Q. Okay. So the day that you attacked her [Jane Doe 5], had you seen her before?

"A. Yeah, I'd met her before."

[¶]…[¶]

"Q. How long had you been there?

"A. Where?

"Q. In Utah when the incident with [Jane Doe 7] -- when you raped [Jane Doe 7]?

"A. I don't know. About three weeks."

Another defense witness was a friend of defendant's, who knew K.B. and Jane Does 1 and 2, and never saw anything unusual between defendant and Jane Does 1 or 2. A facilitator for an anger management class testified defendant successfully completed the court-ordered class and seemed honest and sincere.

## Verdicts and Sentencing

The jury found defendant guilty on all counts and found true the multiple victim allegation.

The trial court subsequently sentenced defendant to a determinate term of 18 years 8 months and an indeterminate term of 90 years to life, consisting of consecutive terms of 15 years to life on each of Counts 1, 5, 6, 9, 10 and 11, plus the upper term of 16 years on Count 2, and four consecutive one-third middle terms of eight months on Counts 3, 4, 7, and 8.

## DISCUSSION

### I. Evidence Code Section 1108 Evidence

### A. Constitutional Challenges

Defendant argues the trial court abused its discretion by admitting evidence of the uncharged acts involving Jane Does 4 through 7, thereby violating his right to equal protection and due process. We disagree.

Evidence Code section 1108 (see fn. 2, *ante*) permits evidence of uncharged sexual misconduct in a sex offense prosecution, for the purpose of showing propensity to commit sex offenses. (*People v. Falsetta* (1999) 21 Cal.4th 903, 907 (*Falsetta*).) The principal justification allowing this propensity evidence is that sex crimes, by their very nature, are usually committed in seclusion without third party witnesses or substantial corroborating evidence; thus, the trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. (*Id*. at p. 915.)

16

Our high court in *Falsetta* held Evidence Code section 1108 does not violate due process. The court acknowledged the general rule prohibiting propensity evidence due to its potential prejudice but held there was no undue unfairness in light of the substantial protections afforded to the defendants in such cases, requiring the trial court to engage in a careful weighing process under Evidence Code section 352. (*Falsetta*, *supra*, 21 Cal.4th at p. 915; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 796-799.) "[T]he trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from defendant's due process challenge." (*Falsetta*, at p. 917.) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of uncertainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta*, at pp. 916-917.)

Defendant acknowledges *Falsetta* defeats his argument that Evidence Code section 1108 violates due process. Ignoring the fact that our high court was asked to reconsider its holding in *Falsetta* that section 1108 is constitutional and found no good reason to do so in *People v. Loy* (2011) 52 Cal.4th 46, 60, defendant argues *Falsetta* was wrongly decided. We, of course, are bound by the opinions of the California Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450), and this court has previously rejected a similar constitutional argument concerning section 1108 evidence for that reason. (*People v. Holford* (2012) 203 Cal.App.4th 155, 183.) Indeed, this court rejected similar arguments prior to the *Falsetta* decision in *People v. Fitch* (1997) 55 Cal.App.4th 172, 178-184 (*Fitch*), and the high court adopted this court's reasoning in *Fitch* in deciding *Falsetta*. (*Falsetta*, *supra*, 21 Cal.4th at pp. 912-915.)

17

Defendant argues Evidence Code section 1108 violates *equal protection*, a matter he says was not decided by the California Supreme Court. Defendant cites *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026-1027, as relying upon *Falsetta* to reject due process and equal protection challenges to Evidence Code section 1109, which allows admission of evidence of prior domestic violence in a prosecution for domestic violence. Defendant claims *Hoover* relied upon *Falsetta,* which must be reconsidered in light of a federal case, *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769 (*Garceau*), reversed on other grounds in *Woodford v. Garceau* (2003) 538 U.S. 202 [155 L.Ed.2d 363].

Defendant's equal protection argument fails for multiple reasons. First, the *Hoover* opinion cited by defendant does not mention the term "equal protection." The term was mentioned in a previous, superseded opinion, but without discussion. (*People v. Hoover* (1998) 64 Cal.App.4th 1422, review granted Sept. 23, 1998, S072374.) However, equal protection was discussed by the *Falsetta* court which, after adopting this court's due process analysis in *Fitch*, upheld the constitutionality of Evidence Code section 1108 against an equal protection claim, also citing *Fitch*. The court in *Falsetta* observed, "*Fitch* likewise rejected the defendant's equal protection challenge, concluding that the Legislature reasonably could create an exception to the propensity rule for sex offenses, because of their serious nature, and because they are usually committed secretly and result in trials that are largely credibility contests. [Citation.] As *Fitch* stated, 'The Legislature is free to address a problem one step at a time or even to apply the remedy to one area and neglect others.…' " (*Falsetta*, *supra*, 21 Cal.4th at p. 918.) Other courts have recognized the *Fitch* and *Falsetta* rejection of the same equal protection challenge to section 1108 defendant makes here. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 994 (*Robertson*).)

Moreover, *Garceau*, the federal case relied upon by defendant, was neither a sex offense case nor an equal protection case. It was a homicide case in which the court found a reversible due process violation in a jury instruction that allowed the jury to draw

18

an inference of criminal propensity from evidence of uncharged drug trafficking activity and an unrelated murder. That case has no applicability here.

Defendant overlooks the fact that the Federal Rules of Evidence allow evidence of other acts of child sexual molestation to show propensity. (Fed. Rules Evid., rule 414(a).[8]) He virtually ignores the fact that due process and equal protection claims concerning those rules have been rejected by federal courts. (See *United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018 (*LeMay*) [admission of other acts of child sexual molestation to show propensity under Federal Rules of Evidence, rule 414, did not violate due process or equal protection[9]; see also *Mejia v. Garcia* (9th Cir. 2008) 534 F.3d 1036, 1047, fn. 5 [rejecting a California defendant's federal habeas corpus claim that Evidence Code section 1108 is unconstitutional and pointing out the analogous Federal Rules of Evidence and the *LeMay* decision holding that the Federal Rules do not violate due process or equal protection.].) Our high court, on the other hand, specifically noted the Ninth Circuit's decision in *LeMay* when it declined to revisit the constitutionality of section 1108 in *Loy*. (*Loy*, *supra*, 52 Cal.4th at pp. 60-61.)

We reject defendant's constitutional challenges.

**B. Admissibility of Uncharged Sexual Misconduct Evidence In This Case**

Defendant argues it was improper to admit evidence of the uncharged offenses in the circumstances of this case, because defendant was not convicted of crimes regarding

---

[8] Federal Rules of Evidence, rule 414(a), provides: "In a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant."

[9] Defendant merely acknowledges in passing, without any discussion, that the court in *LeMay* was one several courts that have "rejected due process challenges to propensity evidence."

the prior conduct, and the evidence was highly inflammatory, dissimilar to the charged offenses, remote, and marginally probative. We disagree.

Under Evidence Code section 1108, the trial court has broad discretion to admit evidence of uncharged offenses. (*Falsetta*, *supra*, 21 Cal.4th at p. 919.) We review the trial court's determination under an abuse of discretion standard of review. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

In assessing admission of uncharged offenses under Evidence Code section 1108, this court identified four factors to consider: (1) whether the uncharged conduct was more inflammatory than the charged offenses; (2) the possibility of jury confusion; (3) remoteness in time of the uncharged offense; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses. (*People v. Harris* (1998) 60 Cal.App.4th 727, 738-741 (*Harris*).) In *Harris*, the defendant, a mental health nurse, was charged with sexually abusing two women patients who were vulnerable because of their mental health condition. (*Id.* at p. 730.) This court described the conduct underlying the charges as "at worst [the] defendant licked and fondled an incapacitated woman and a former sexual partner, both of whom were thereafter on speaking terms with him" and involved a breach of trust by a caregiver. (*Id.* at p. 738.) Evidence of a 23-year-old incident involving residential burglary, brutal rape, beating and stabbing of a stranger for which defendant was only convicted of residential burglary was admitted under section 1108. (*Id.* at pp. 733-735.) This court held that the evidence was improperly admitted, because: the evidence of the prior crime was inflammatory "*in the extreme*" and far more inflammatory than the charged offenses (*id.* at p. 738); the evidence that defendant was only convicted of residential burglary and inflicting great bodily injury could have caused the jury to conclude the rape was "unrevenged," thus creating a probability of jury confusion (*id.*); the defendant had led a "blameless life" during the 23 years and the incidents were "so totally dissimilar" as to lack "any significant probative value." (*Id.* at pp. 739-740.)

20

Here, the uncharged offenses were no more inflammatory than the charged offenses. To the contrary, the evidence involving the sexual abuse of the charged offenses was far more disturbing because it involved ongoing abuse of defendant's natural daughter and two girls for whom he had assumed a a father figure role.

Defendant contends that the uncharged offenses were "completely dissimilar" for the reason that the relationship he had with the victims in the charged offenses was different than that he had with the Evidence Code section 1108 victims, acknowledging that in the charged offenses, he violated a position of trust and authority over his daughter and "quasi-stepdaughters." In his reply brief, he acknowledges there are some similarities, but argues that the similarities do not establish a modus operandi. As our high court has recognized, Evidence Code section 1108 conduct need not be similar to be admissible. (*Loy*, *supra*, 52 Cal.4th at p. 63.) " '[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108. [Citation.]' " (*Id*.) Thus, while similarity is a factor, it plays a smaller role than it does in Evidence Code section 1101, subdivision (b), analysis. (*Roberston*, *supra*, 208 Cal.App.4th at p. 991.)

Here, the uncharged sexual misconduct was similar. It involved rape, attempted rape, and grabbing the breasts and vaginas of four young girls, both over and under clothing. The current offenses involved rape and fondling the breasts and vagina of three young girls. For six out of the seven girls, defendant or his brother or uncle had a relationship with the mother that allowed defendant access to prey upon the girls opportunistically, and he did so. All but one of the crimes was committed inside or just outside a family home. Many of the incidents were perpetrated on a bed inside of the home. Defendant exposed at least two of the victims (Jane Doe 3 and Jane Doe 5) to

21

pornography on a computer. The similarities here enhanced the probative value of the Evidence Code section 1108 evidence.

Defendant points out that the uncharged offenses occurred when defendant was between ages 14 and 22. Although defendant says his youth, while not an excuse, puts things "in a different light," defendant's relative youth at the time of the first offense actually demonstrates a deep seeded propensity for such conduct with young girls of relatively the same age -- girls that are substantially younger than he -- that began when he was also young and persisted into adulthood.

This case is thus unlike *Harris*, upon which defendant relies heavily. In *Harris*, this court charged that the crimes were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury" as uncharged misconduct. (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) Moreover, unlike in *Harris*, we see no indication that the uncharged offenses here created any danger of confusing the jury.

Defendant argues the uncharged offenses were remote, with almost 40 years between some of the uncharged and charged offenses. No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. (*Robertson*, *supra*, 208 Cal.App.4th at. p. 992.) "In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However,…significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.) Here, defendant's focus on 40 years is unavailing, because he did not lead a blameless life for 40 years or even 23 years, as the defendant in *Harris*. Rather, as we have noted the evidence demonstrates deep seeded propensity for sexual conduct with young girls of relatively the same age who are substantially younger than him and for whom he had access to because

22

of a family relation.[10] His misconduct began around 1974, resumed against the same victim (Jane Doe 4) around 1979 and continued for a few years, was redirected to Jane Doe 5 in 1980, then to Jane Doe 6 in 1982, and Jane Doe 7 in 2001. In the meantime, between the incidents involving Jane Doe 6 and Jane Doe 7, defendant molested his own daughter, Jane Doe 3 (charged offenses) beginning around 1998 and continuing for two years. The most recent incidents were the charged offenses against Jane Doe 1 and Jane Doe 2 between 2006 and 2009. Thus, in the 38-year span, the longest period of inactivity based on the evidence was between 1982 and 1998 -- 16 years.

In *People v. Waples* (2000) 79 Cal.App.4th 1389, the court held uncharged sexual offenses involving the same victim occurring between 15 and 22 years before trial were not too remote, in part because the similarities balanced out the remoteness. (*Id.* at p. 1395.) In *Branch*, *supra*, 91 Cal.App.4th 274, the court held a 30-year gap between defendant's molestation of his 12-year-old stepdaughter (the uncharged offenses) and his molestation of his 12-year-old step-great-granddaughter (the charged offenses) was not too large a gap because the similarities balanced out the remoteness. (*Id.* at p. 285.) In *Robertson*, the court held that similar prior kidnapping and sexual misconduct occurring 34 years prior to the charged kidnapping and sexual assault was admissible under Evidence Code section 1108. Here, the similarities and the protracted pattern of sexual abuse involving multiple victims more than balanced out any remoteness. Indeed, the evidence was highly probative, especially in light of defendant's attempt to paint the instant victims as liars.

---

[10] We note that the circumstances described by Jane Doe 5 -- defendant's male acquaintances bringing defendant to the house where she was and ignoring her cries for help -- also suggest defendant took advantage of access to a victim, even though she was not related to defendant. Moreover, there were similarities to the charged offenses. Part of the incident occurred on a bed in a bedroom as did some of the offenses involving the charged victims, and defendant grabbed Jane Doe 5's breasts and vagina as he did with the charged victims.

Defendant points out that the evidence reflected no convictions for his prior sexual misconduct and argues this would have led jurors to believe he had escaped punishment for those earlier acts. Defendant again relies on *Harris*, where the defendant was allowed to plead to non-sexual assault offenses, and this court observed that the jury the jury could have concluded that defendant "escaped appropriate rape charges and was merely convicted of burglary, leaving the rape victim unrevenged," thus increasing the likelihood the jury might seek to punish defendant for the uncharged offense by convicting him of the charged offenses. (*Harris*, *supra*, 60 Cal.App.4th at p. 738.) We agree that the lack of evidence of prior convictions is a factor that cuts against admissibility of Evidence Code section 1108 evidence (*People v. Ewolt* (1994) 7 Cal.4th 380, 405), but it is just one factor, and it is perhaps more important in cases where the prior conduct is more inflammatory compared to the charged offenses, as in *Harris*. As we have noted, that is not the case here. Moreover, at the beginning of the trial and again at the end of the trial, the court instructed the jury to not consider punishment in deciding the verdict, and we presume the jury followed these instructions. (*People v. Thomas* (2011) 51 Cal.4th 449, 487.) On balance, the lack of prior convictions does not tip the scales in favor of precluding the highly probative Evidence Code section 1108 evidence in this case.

We conclude the trial court did not abuse its discretion in allowing the evidence of uncharged offenses. We therefore need not address the arguments about harmless error.

## II. One Strike Sentencing

Defendant argues that application of the one strike sentencing statute (§ 667.61, subds. (b), (c), (e) [15 years to life for sex offenses against more than one victim]), to the convictions involving Jane Doe 3, defendant's daughter, violated the ex post facto constitutional prohibitions (U.S. Const., art. I, § 10 ["No state shall…pass any…ex post facto law."]; Cal. Const., art. 1, § 9 ["A[n]…ex post facto law…may not be passed."]). He argues there was no proof that any of the three counts involving Jane Doe 3, which were alleged to have occurred between August 1, 1994, and August 31, 2001, were

24

committed after the effective date of the statute, November 30, 1994. Defendant argues the issue is cognizable on appeal despite his failure to object in the trial court. Alternatively, defendant argues his trial counsel's failure to object constituted ineffective assistance of counsel.

We conclude that defendant's contention lacks any merit and the allegation that trial counsel provided constitutionally ineffective assistance for failing to object on ex post facto grounds is completely unwarranted. As we discuss in more detail *post*, Jane Doe 3 was only one year old when the One Strike law took effect, and the evidence established beyond a reasonable doubt that the molestations took place after the effective date of the statute.

Defendant relies heavily on *People v. Hiscox* (2006) 136 Cal.App.4th 253, 259. The *Hiscox* court held that ex post facto principles preclude sentencing under section 667.61 for sex offenses committed before the November 30, 1994, effective date of the statute, because the sentences prescribed by section 667.61 greatly exceed the determinate sentences previously available for sex offenses. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 257.) The court also held, "it is the prosecution's responsibility to prove to the jury that the charged offenses occurred on or after the effective date of the statute providing for the defendant's punishment. When the evidence at trial does not establish that fact, the defendant is entitled to be sentenced under the formerly applicable statutes even if he raised no objection in the trial court." (*Id*. at p. 256.) The *Hiscox* court also held that the failure to register an ex post facto objection in the trial court does not forfeit the issue on appeal. (*Id*. at p. 259.)

In *Hiscox*, the pleading alleged 11 counts of lewd and lascivious conduct with three child victims, committed between 1992 and 1996, and the jury was not instructed to make findings whether any offense was committed after November 30, 1994. (*Hiscox*, *supra*, 136 Cal.App.4th at pp. 257-258.) The evidence showed that the mother and the three victims lived in different residences between 1992 and 1996, but none of the

witnesses were certain about when the move between the residents occurred. Accordingly, the court reasoned that the testimony regarding where the offenses occurred did not show whether the offenses happened before or after section 667.61 took effect. The one charge the People asserted "certainly" occurred after the effective date of section 667.61 was purportedly perpetrated against the victim when he was in the first grade, but no testimony established how old the victim was when he was in the first grade. Furthermore, the victim was not certain. He testified that the molestation occurred " 'probably about the first grade.' " (*Id.* at p. 261) The court concluded, "[o]n this state of the evidence, it simply cannot be said the prosecutor succeeded in establishing that any particular offense was committed when section 667.61 was in effect."

Here, although the pleading alleged the offenses occurred between August 1, 1994, and August 31, 2001, *the testimony narrowed that time frame to the two years preceding the 2001 date*. Jane Doe 3 who was born November 18, 1993, was only one year old when the One Strike law took effect in November of 1994. The evidence showed that when she was about nine months old, the family moved from Montana, where Jane Doe 3 was born, to California where they lived on the maternal grandparents' ranch on Jackson Highway and then in a trailer for a short time. Defendant and his ex-wife had another child, a son, born July 4, 1999. The ex-wife testified the family then moved into the apartment on Stockton Boulevard in Sacramento weeks after the son was born, when Jane Doe 3 was about five and a half years old. Jane Doe 3 specifically testified that all the molestations she remembered occurred when they were living in that apartment. That was the last residence shared by the victim and defendant before defendant's ex-wife separated from him, and he left, no longer having access to Jane Doe 3. Though there was some discrepancy in that Jane Doe 3 remembered having her own bedroom while others testified the apartment had only one bedroom shared by the whole family, that minor detail is inconsequential in light of the totality of evidence.

The evidence leaves no doubt that all three counts of defendant's sexual abuse of Jane Doe 3 occurred after the one strike sentencing statute, section 667.61, took effect in November 1994, when Jane Doe 3 was only one year old. Although the prosecutor in closing argument to the jury said defendant molested Jane Doe 3 beginning in 1994, the prosecutor's remarks were not evidence, as the jury was instructed. And defense counsel in closing argument to the jury acknowledged that Jane Doe 3 was claiming things that happened to her when she was four or five years old -- a statement consistent with Jane Doe 3's own testimony. Indeed, defendant's appellate brief, in arguing improper admission of uncharged offenses, stated, "The charged offenses involving Jane Doe 3 allegedly occurred between 1994 and 2001. [Citation.] However Jane Doe 3 was born November 18, 1993…. It was unclear when the earliest molestations occurred.… However, it is reasonable that some would have been closer to the late 1990's, based on her description of what she recalled. This conclusion is a reasonable inference based on her testimony describing events with [defendant] and her age."

Here, there was no evidence of any act before November 30, 1994, at which point the victim was only one year old. There is no reasonable doubt that all three counts occurred after November 30, 1994. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 261 [evidence is insufficient to establish dates for purposes of application of the ex post facto rule unless the evidence leaves no reasonable doubt that the underlying charges pertained to events occurring on or after November 30, 1994].)

Defendant's sentence did not violate the ex post facto prohibitions and defense counsel did not provide constitutionally ineffective assistance of counsel.

### III. Presentence Credits

Defendant's opening brief argues the trial court shortchanged him on presentence credits under sections 4019 and 2933.1. He notes the trial court verbally awarded him a total of 998 days of presentence credit (868 actual days plus 130 conduct credit), but the abstract of judgment says only 939 days total. Defendant's opening brief says both are

wrong, and the actual number should be a total of 1,000 days (870 actual days from his February 9, 2009, arrest, to his June 27, 2011, sentencing, plus 130 conduct credit under section 2933.1). The Attorney General's brief agrees math errors occurred due to repeated continuance of the sentencing date, but the Attorney General says the correct amount is a total of 999 days (869 plus 130). Defendant's reply brief acknowledges the trial court on January 13, 2012, issued a corrected abstract of judgment at his request, showing a total of 998 days rather than the 1,000 days he requested. Defendant's reply brief says he checked the math and came up with yet another total -- 1,007 days. Defendant does not explain why his earlier calculation was incorrect. We did the math and came up with a total of 1,000 days.

We order modification of the abstract of judgment to show a total of 1,000 days presentence credits (870 actual days plus 130 days of conduct credit).

### IV.  Section 1465.8 Fees

Defendant argued in his opening brief that the trial court overcharged him for section 1465.8 court operations assessment fees, but his reply brief acknowledges the issue has become moot because the trial court, upon defendant's informal request, issued a corrected abstract of judgment correcting the amount to $440. We therefore need not address the matter.

## DISPOSITION

The judgment is modified to show a total of 1,000 days presentence credits.  The trial court shall prepare an amended abstract of judgment and forward a copy to the California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


            MURRAY        , J.


We concur:


      ROBIE        , Acting P. J.


      HOCH        , J.