Filed 7/15/15  P. v. Ellis CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

<u>COPY</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>KEVIN ELLIS,<br><br>      Defendant and Appellant. | C075745<br><br>(Super. Ct. No. CRF120971) |

A jury convicted defendant Kevin Ellis of numerous counts, including lewd or lascivious acts on two children both under the age of 14, failing to register as a sex offender, and giving marijuana to a minor under the age of 14.  The jury also found to be true allegations regarding prior convictions and multiple victims.  The trial court denied defendant's motion for new trial and sentenced him to a determinate term of 20 years and four months plus a consecutive indeterminate term of 100 years to life in state prison.

On appeal, defendant contends the trial court erred in denying his motion for new trial and admitting evidence of his prior acts of misconduct.  He further contends, and the

1

People concede, that he is entitled to additional conduct credit. We shall modify the judgment to correct the error in computation of conduct credit and otherwise affirm the judgment in all respects.

## FACTUAL BACKGROUND

Defendant was once married to Jeanette Schaffer. Together, they had two daughters, Sarah and Cassie.[1] When defendant and Jeanette separated in the mid-1980s, Jeanette and the children moved out of the home they shared, but defendant maintained visitation with his daughters.

In mid-2008, defendant moved into Cassie's home in West Sacramento, where he lived for approximately nine months. Cassie knew defendant was required to register as a sex offender but, when she asked him whether he needed to register, he told her he "didn't have to do that anymore."

In June 2008, Sarah married Bryan B. They each had children from prior relationships, including Bryan's son J.B. (born in July 1998), and later had two more children together. Bryan's nephew D.B. (born in May 1999) also lived with the family.

*Incidents in the Trailer*

In June 2009, Sarah, Bryan, and the children moved to West Sacramento. They lived in a tent in Jeanette's back yard for two months, then moved to a home on Citrus Street. During that two-month period, defendant lived in a trailer on his cousin's property. Sarah, Bryan and the kids occasionally visited defendant in the trailer. Like Cassie, Sarah knew about defendant's past convictions for child molestation but he had explained that he "was all better" and she "didn't have any reason to not trust [him]."

When J.B. was in fifth grade, he visited defendant several times in the trailer. The first incident in the trailer occurred when defendant and J.B. were alone. Defendant

---

[1] In order to protect the privacy of the victims and to avoid confusion, we refer to certain individuals either by their first names or their first and last initials.

asked two or three times if he could suck J.B.'s penis. J.B. did not want him to but finally agreed and defendant orally copulated him. J.B. was scared and wanted to go home. Defendant gave J.B. marijuana, which J.B. smoked from a pipe. J.B. spent the night in the trailer with defendant, who slept naked. Defendant told J.B. not to tell anyone what had happened. J.B. later told his cousin, D.B., that defendant let him "smoke pot", but did not tell D.B. that defendant touched him.

The next two incidents in the trailer occurred when J.B. (still in fifth grade) and D.B. (in fourth grade) visited the trailer together. On one occasion, defendant made J.B. unzip his pants and defendant touched J.B.'s penis. On another occasion, both boys masturbated themselves at defendant's request, then watched a pornographic DVD while defendant masturbated. Defendant told the boys not to tell anyone "or I'll get in trouble." D.B. did not tell anyone because he was afraid of defendant.

*Incidents in the Hut/Tent*

In August 2009, defendant built a hut (sometimes referred to by various witnesses as a tent) off the back of Bryan and Sarah's house on Citrus Street, where he stayed for approximately three weeks.

Several incidents occurred while defendant lived in the tent. On one occasion, J.B. (still in fifth grade) and D.B. (still in fourth grade) arrived at the tent and found defendant on his hands and knees with his pants down. He asked the boys to put their "penis in his butt." J.B. tried to comply by pulling his own pants down and touching defendant's "butt" with his penis, but then stopped because he did not know what to do and did not want to do it. D.B. touched his penis to defendant's "butt" for approximately 10 seconds but then stopped.

On another occasion in the tent, defendant showed J.B. and D.B. pictures; one of himself naked with a vacuum hose inserted in his anus, and one of his naked ex-wife. D.B. also recalled a time when he and J.B. were in the tent when defendant put a "Bic" lighter in his own anus.

Defendant masturbated both J.B. and D.B. in the tent. Once, when both boys were visiting, defendant had his pants down to his knees with his penis exposed and was masturbating himself. He asked the boys to masturbate him but they refused. D.B. recalled a time when he and J.B. were masturbating while defendant was in the tent. J.B. recalled one time defendant orally copulated him when he and D.B. were in the tent.

*Defendant's Sexual Misconduct is Reported*

J.B. revealed the molestation to his cousin B.B., who then told Sarah, in June 2010. Then, in November 2011, J.B. told his cousin Je.B. about everything defendant had done, and said he tried to protect D.B. by doing "more of what [defendant] asked so that [D.B.] didn't have to." J.B. felt ashamed and did not want Je.B. to tell anyone, particularly his grandmother. Nonetheless, Je.B. immediately reported the information to the Healdsburg Police Department. She and J.B. went to the police department and told Detective Darryl Erkel what happened.

*Defendant's Prior Sexual Misconduct*

Cassie and Sarah's childhood friends, J.M. and M.B., both testified regarding defendant's prior sexual misconduct.

J.M. testified to two incidents involving defendant when she was 11 years old. The first incident occurred when J.M., Sarah, and Cassie, were wrestling and tickling each other and "having fun." Defendant grabbed J.M.'s breast over her clothing and squeezed for a few seconds. The second incident occurred when J.M. was spending the night at Sarah's house. The three girls were laying down in the living room. Defendant came into the room and told J.M. that if she wanted a blanket she would have to lay down with him on the fold-out couch. When J.M. laid down beside him, defendant touched her vaginal area over her clothing, and then took her hand and placed it on his erect penis (over his clothing) and began rubbing until she pulled away. Shortly after the second incident, J.M. told her mother what happened and her mother contacted the police.

M.B. testified to an incident involving defendant that occurred when she was 14

4

years old. On that occasion, Sarah invited her to spend the night. Defendant told M.B. her mother had given him permission to give M.B. alcohol. Defendant gave Sarah and M.B. vodka and orange juice. Both girls drank the mixture and then went to lie down and talk. Defendant came into the room and asked M.B. if she wanted him to touch her and take her clothes off, and if she wanted to "have fun with him." When M.B. told him "no," defendant made Sarah leave the room. He took M.B.'s clothes off and touched her on her breasts, her "private," and her "butt" for approximately 15 minutes. He then "climbed on top of [M.B.] and started having intercourse with [M.B.]," despite her repeated pleas that he stop and get off of her. Defendant told her he "was just playing" and "just having fun" and "it was going to be okay." Sarah banged on the bedroom door and told defendant to stop. When defendant finally left the room, M.B. and Sarah climbed out the bedroom window and ran to a nearby apartment for help.

Defendant's prior sexual misconduct resulted in at least one 1995 conviction for lewd and lascivious acts with a child under the age of 14 (Pen. Code, § 288, subd. (a))[2], subjecting him to lifetime sex offender registration (§ 290).

Detective Michelle Tate testified that there was no evidence of defendant having registered in 2008 or 2009 when he was living in West Sacramento. According to official records, he last registered in 2002.

## PROCEDURAL HISTORY

Defendant was charged by information with six counts of lewd or lascivious acts on a child under 14 (§ 288, subd. (a)—counts 1 through 3 [as to Doe 1] and counts 4 through 6 [as to Doe 2]), failing to register as a sex offender (§ 290.012, subd. (a)—count 7), and giving marijuana to a minor under 14 (Health & Saf. Code, § 11361, subd. (a)—count 8). The information specially alleged: As to counts one through six, defendant

---

[2] Undesignated statutory references are to the Penal Code.

was previously convicted of violating section 288, subdivision (a) (§ 667) and committed the offense against more than one victim (§ 667.61, subd. (e)(5)); and, as to each of the two victims, defendant administered a controlled substance to the victim by force, violence or fear (§ 667.61, subd. (e)(7)).

On October 18, 2013, the jury found defendant guilty on all but one of the charges (count 5), and found true the allegations that defendant was previously convicted of violating section 288, subdivision (a), and that he committed the alleged crime against more than one victim (§ 667.61, subd. (e)(5)). The court declared a mistrial as to count five.

Defendant filed a motion for new trial based on alleged juror misconduct. Following an evidentiary hearing, the trial court denied the motion. The court sentenced defendant to 20 years and four months plus 100 years to life in state prison, imposed various fees and fines, and awarded defendant 786 days of presentence custody credit (693 days of actual custody credit plus 93 days of conduct credit).

Defendant filed a timely notice of appeal.

## DISCUSSION

### I.

### *Motion for New Trial*

Defendant contends the trial court abused its discretion in denying his motion for new trial by ignoring Juror No. 1's "clear admission[s]" that she had prejudged the case prior to deliberation, and by ascribing to the juror's testimony and statements to the defense investigator, a meaning not otherwise conveyed by those words. We find defendant's contentions to be without merit.

6

Defendant filed a motion for new trial based on alleged misconduct on the part of Juror No. 1. The evidence in support of defendant's motion included a copy of an article on the Davis Vanguard website regarding the trial, together with comments posted in response to the article, including the following:

[Posted by "eagle eye" on October 18, 2013, at 8:44 p.m.]: "As of a couple of days ago, one juror was sure he [defendant] was guilty. Asked why a guilty defendant would go to trial rather than work out a plea, in light of the graphic testimony and shocking details, the answer was that the defendant appeared to enjoy the attention of the trial, and appeared smug. It will be extremely difficult, if not impossible, to overcome juror's belief—formed on the first day of testimony, and reinforced for five more days or so—that the defendant is anything but guilty. [Defense expert] O'Donohue's expert testimony may have come too late in the proceedings to overcome first impressions."

[Posted by "Mr Obvious" on October 18, 2013, at 11:59 p.m.]: "Is someone soliciting a juror for information?"

[Posted by "eagle eye" on October 19, 2013, at 12:57 a.m.]: "No. The juror was very, very upset about testimony/evidence that young children had been badly abused/molested and wanted to unload a little bit without saying too much about an ongoing trial. My question to the juror was hypothetical; I didn't expect an answer. I had my own ideas about the reason for a trial but didn't want to say what I thought and take any chance on influencing the juror."

Defendant's motion was also supported by two reports authored by defense investigator Aaron Bohrer following his post-verdict interviews of Juror No. 1 and Jean Miller (Juror No. 1's neighbor).

According to the first report, Bohrer interviewed Miller at her home on November 8, 2013. During that interview, Miller admitted having posted comments as "eagle eye" on the Davis Vanguard website, and confirmed that her comment that "one juror was sure he [defendant] was guilty" was not an exact quote from Juror No. 1.

7

Miller said that, during the trial, she and Juror No. 1 had "no fewer than three" conversations regarding the trial during which Juror No. 1 discussed numerous aspects of the case. According to the second report, Bohrer interviewed Juror No. 1 at her home on December 19, 2013, at which time Bohrer "asked Juror No. 1 when she was definitively sure of [defendant's] guilt" and "Juror No. 1 answered that it was after the children testified."

The trial court conducted an evidentiary hearing on defendant's new trial motion, which included the following testimony of Miller, Bohrer, and Juror No. 1.

Miller testified she had several conversations with her neighbor, Juror No. 1, in October 2013 when Juror No. 1 was an active juror in defendant's trial. According to Miller, Juror No. 1 initiated conversations in which she talked "briefly" about the trial. During those conversations, Juror No. 1 gave Miller an "overview" of the trial; said "terrible things had been done to these kids"; indicated there were several children involved; discussed that one parent was being released from jail so that another parent could go to jail; and discussed that someone was living in a tent "put together with mattresses and then covered over with a tarp."

Miller acknowledged having posted the comments online in response to the Davis Vanguard article. She testified that while Juror No. 1 never said the words, "Kevin Ellis is guilty," Miller believed Juror No. 1 formed the opinion defendant was guilty "on the first day of testimony" because Juror No. 1 said "that horrible things happened." Miller also believed Juror No. 1's "mind was so made up that it didn't matter what I said."

Bohrer testified he was assigned by the public defender's office to investigate Miller's comments on the Davis Vanguard website and, to that end, had met with Juror No. 1 at her home after entry of the verdict. Bohrer testified Juror No. 1 told him she had only briefly discussed with Miller that she was on the jury, she was sure of defendant's guilt "[a]fter the boys testified," and "the testimony of the children convinced her of [defendant's] guilt prior to her beginning deliberations on the case." However, Bohrer

8

could not recall the specific language he used in asking Juror No. 1 when she was sure of defendant's guilt.

Bohrer further testified that Juror No. 1 said she considered Miller to be "an overly nosey neighbor" who was "always trying to pry into [Juror No. 1's] business" and "had some type of fixation with the courts or the laws or court cases." When Bohrer asked what she thought of defendant, Juror No. 1 said he was a "predator, monster." She also thought "the prosecutor, the defense attorney, and the judge were professional," and felt "the justice system worked because [defendant] got a trial and a jury to decide the case."

Juror No. 1 testified that, while she had brief conversations with Miller, she never told Miller she believed defendant was guilty, nor did she ask Miller for her opinion or listen to Miller talk about the case. With regard to defendant's guilt, Juror No. 1 testified as follows:

"[Q]: Do you remember Mr. Bohrer asking you a question about when you personally determined that [defendant] was guilty?

"[Juror No. 1]: Yes.

"[Q]: And what did you tell Mr. Bohrer?

"[Juror No. 1]: I don't remember exactly, but it was very early in the trial.

"[Q]: And when you began deliberating, did you ever comment to the other jurors, I think he's been guilty since—

"[Juror No. 1]: No, we never discussed that until we went into deliberation.

"[Q]: Did you deliberate with an open mind?

"[Juror No. 1]: Yes.

"[Q]: Did you listen to the opinions of the other jurors when you were deliberating?

"[Juror No. 1]: Yes. It was very unanimous.

"[Q]: And your jury did not convict [defendant] of all counts, did it?

"[Juror No. 1]: No.

"[Q]: And some of the enhancements were found to be not true; correct?

9

"[Juror No. 1]: Yes.

"[Q]: Do you believe you were an impartial juror in [defendant's] case?

"[Juror No. 1]: Yes.

" [¶] . . . [¶]

"[Q]: If I use the term 'nosey neighbor,' does that apply to Ms. Miller?

"[Juror No. 1]: Yes.

"[Q]: And why is that?

"[Juror No. 1]: Because she always asks where I've been, what I've done, who I saw, how long I was gone.

" [¶] . . . [¶]

"[Q]: And you never told Ms. Miller you believed [defendant] was guilty before you began deliberations?

"[Juror No. 1]: No."

On cross-examination, Juror No. 1 testified in part as follows:

"[Q]: You indicated just now on cross that you determined very early in the trial that [defendant] was guilty; is that correct?

"[Juror No. 1]: Mm-hmm, yes.

"[Q]: That was before all witnesses had testified and before all evidence had been presented to the jury?

"[Juror No. 1]: I was leaning towards guilt, and it seemed like every day it got stronger and stronger and stronger.

"[Q]: . . . Did you ever talk about the testimony that you heard with Ms. Miller in any way?

"[Juror No. 1]: Not directly, no.

"[Q]: But you indicated early on that you had an attitude that he was guilty?

"[Juror No. 1]: I came into the courtroom as a juror with an open mind, but every bit of testimony and evidence moved me more and more towards guilt.

10

" [¶] . . . [¶]

 "[Q]: . . . And in those conversations that you had with her [Miller] after your service was done, at any point did you tell her that early on in the process, your mind was made up that [defendant] was guilty?

"[Juror No. 1]:  No."

Juror No. 1 further testified she took notes "[d]uring the trial."  When asked whether she took notes of the testimony of each witness, she further testified, "Pretty much, yes.  A running of which witness and a little summary of what they said, yes, I did, in the little book that was given to me in the packet there.  [¶] . . . [¶]  I just summarized what the witness said.  I didn't put down my opinions in the notes."  She confirmed that she took notes during all the evidence.  When the court inquired about her interaction with Miller, Juror No. 1 stated Miller came over to talk to her "[e]very day" and "sort of pops out the minute my car drives in."

Following subsequent argument from counsel, the trial court ruled initially as follows:

"Having listened to the testimony of both Ms. Miller and [Juror No. 1], I have come to the conclusion that I cannot accept anything that Ms. Miller has said.

"Let's talk first about who these two people are.  [Juror No. 1] describes Ms. Miller as, I guess, the local busy body, and I think Ms. Miller confirms that that is true.

"What we know is that when [Juror No. 1] would drive up to her home, Ms. Miller would come out and meet her in the driveway and ask her questions about what she had been doing that day.  These interactions were described by [Juror No. 1] as driveway moments.

"Conversations, if you want to call them that, would be brief, and [Juror No. 1's] strategy was to answer Ms. Miller's questions with questions of her own.

"Ms. Miller clearly believes that [Juror No. 1] suffers from some kind of psychological problem.  She talked about how it was significant to her that [Juror No. 1]

11

used back roads rather than freeway to drive from Davis to Dixon. She felt that [Juror No. 1] was overly dramatic or perhaps lying.

"I couldn't tell, when [Juror No. 1] would describe physical ailments that other people had, whether it was a family member of the folks who did landscaping or her own daughter's health.

"She even—she, that is Ms. Miller, even thought that [Juror No. 1] might suffer from Asperger Syndrome because according to Ms. Miller, [Juror No. 1] was subject to outbursts, one of which—which I think is indicative of Ms. Miller's attitude toward [Juror No. 1]—was in a situation that apparently occurred years ago when [Juror No. 1] accused Ms. Miller of prejudice.

"Given the way each of the two women describes the other, it is utterly illogical to think that [Juror No. 1] would be sharing confidences such as those described by Ms. Miller with Ms. Miller.

"If I had any nagging doubt about the accuracy of what Ms. Miller said, it was dispelled for me when I talked to [Juror No. 1] about a purported episode where Ms. Miller found [Juror No. 1] on the porch of her house. [Juror No. 1] was supposedly drinking wine, and [Juror No. 1] talked at some length about the evidence that she had heard in the trial.

"When I asked [Juror No. 1] about that very subject, [Juror No. 1] turned to me, and whether her face reflected surprise or disbelief, it was clear from [Juror No. 1's] perspective that that kind of interaction had never occurred, not only on this occasion, but ever.

"Now, if—I think those facts are the primary things that cause me to conclude that one could not accept what Ms. Miller said. Perhaps she can be forgiven because she herself said that she suffered from what she called some kind of cognitive disorder.

"Whether Ms. Miller is simply an unreliable reporter of information or whether she intentionally distorted what had occurred in this case, the fact of the matter is that I

cannot and do not accept what Ms. Miller said as a factual description of her interaction with [Juror No. 1] during the course of the trial.

"A fair question that could be asked is how did Ms. Miller know many of the details about the trial, many of the details she said she learned from [Juror No. 1], if they didn't come from [Juror No. 1]. When I read the various articles in the Davis Vanguard, articles that were appended to both the defense brief and the People's opposition, all of that information was incorporated in those articles. And it's clear from everything that Ms. Miller said that she is an avid reader of the Vanguard.

"So all that information was available to her, and she could use it to, quote, reconstruct these purported conversations with [Juror No. 1].

"So whether we conclude that Ms. Miller deliberately attempted to embarrass [Juror No. 1] or that she is simply an unreliable reporter, the conclusion is that there is no credible evidence that [Juror No. 1] committed misconduct by discussing the case with Ms. Miller.

"That leaves us with the other issue that frankly, we spent more time discussing, and that is the question of purported actual bias . . . ."

At a subsequent hearing, the trial court denied defendant's motion for new trial, concluding as follows:

"The testimony that we heard from the defense investigator is that [Juror No. 1] said she was certain of the defendant's guilt, quote, after the boys testified. That is slightly different than what she told the investigator during the interview itself.

"As you will recall, Mr. Bohrer could not remember, when he testified, what his question to [Juror No. 1] was.

"The report that is appended to the motion for a new trial says that he asked, quote, if the testimony of the children convinced her that [defendant] was guilty before deliberations began, which is a compound question, and her answer to that question was yes.

13

"Now, that interview occurred more than two months after the verdict was read in this particular case.

"So the question that we have to resolve is whether [Juror No. 1's] 'yes' means that she immediate—knew immediately after the two boys testified that the defendant was guilty or whether looking back on her decision-making process some two months later she found that the boys' testimony was the determinative issue as to the defendant's guilt.

"If the former is true, then [Juror No. 1] did, in fact, prejudge the case, but if the latter is true, then she did nothing wrong.

"My own experience as a decision maker makes me skeptical of the conclusion that the juror actually prejudged the evidence.

"To believe the presumption theory is accurate, you have to assume that the juror knew at the time of the testimony that it was critical.

"You have to assume that at that particular point in time she decided that none of the succeeding testimony, which, of course, she hadn't heard, would be important and then, in essence, she stopped listening to the testimony.

"In this case she would have stopped listening to the testimony for five additional days.

"There's no question that the boys' testimony was emotional, and obviously any reading of the transcript would show that the testimony was important, but those two observations don't mean that [Juror No. 1] turned off her mind or stopped listening, as the case may be.

"In the hundreds of cases that I have presided over, I've found that no matter how compelling or emotional certain testimony is, you simply can't and don't turn off your mind to the remainder of the evidence.

"So even if you'd rather not be doing it, you are constantly reevaluating the significance of emotional testimony.

"Now, after the case is over with 20/20 hindsight, it is easy to review the testimony and say this testimony was the critical piece of evidence in the case.

"In listening to what [Juror No. 1] said when she was here in court and thinking about my own observations of [Juror No. 1] while she was serving on the case, I have concluded that her statement is one that involves that 20/20 hindsight.

"[Juror No. 1] testified that she was, in fact, an impartial juror, that she deliberated with an open mind.

"She described her decision-making process this way: She said 'I came into the case with an open mind, but all of the evidence moved me towards guilt.'

"My own observations corroborate that the conclusion that she had listened and she assessed what all of the witnesses said.

"I saw her taking notes as each witness testified, and in fact, she confirmed that she took notes.

"She also said she would summarize what each witness said after she heard that witness' testimony.

"It is also a fact that [Juror No. 1] was one of the more than half dozen jurors who submitted questions to the witnesses during the course of the trial.

"So my own observations corroborate the conclusion that [Juror No. 1] remained engaged throughout the entire trial process.

"So taking all of that evidence together, it is my conclusion that [Juror No. 1] did not manifest actual bias but rather that she was a conscientious juror who did her job just as she had promised to do.

"Now, that having been said, it is worth looking at the case cited by the defense [*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778 (*Grobeson*)], because I think it points out the differences between what happened in that case and what happened in this case.

"First, in *Grobeson*, there was evidence that at the very time that the juror came to a conclusion that she was convinced by certain evidence, she told one of her fellow jurors that that was her belief, so we have a statement made contemporaneous with the supposed prejudgment.

"And frankly, the other thing is that having reviewed all of the declarations from the jurors, the trial judge simply did not believe the juror's testimony when she said that she did nothing wrong.

"So I understand why the trial judge and ultimately the Appellate Court came to the decision they came to in *Grobeson*, but that is very different from the situation here.

"So I would deny the motion for a new trial in this case . . . ."

A trial court's decision whether to grant or deny a new trial motion is discretionary and " ' "will not be disturbed [on appeal] unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328; see also *People v. Thompson* (2010) 49 Cal.4th 79, 140.) "When a party seeks a new trial based on juror misconduct, the trial court must determine from admissible evidence whether misconduct occurred and, if it did, whether the misconduct was prejudicial. [Citation.] Prejudice is presumed where there is misconduct. This presumption can be rebutted by a showing no prejudice actually occurred or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. [Citation.]" (*People v. Loot* (1998) 63 Cal.App.4th 694, 697.) "The moving party bears the burden of establishing juror misconduct. [Citations.]" (*Donovan v. Poway Unified School Dist*. (2008) 167 Cal.App.4th 567, 625.)

We find no abuse of discretion in the trial court's denial of defendant's motion for new trial. Juror No. 1 never denied having told Bohrer, in a post-verdict interview, that she felt defendant was guilty "very early in the trial." Bohrer reported Juror No. 1 told him she was definitely sure of defendant's guilt "after the children testified," and

16

answered, "Oh yes" when he asked if the testimony of the children convinced her defendant was guilty before beginning deliberations. However, he could not recall the specific language he used in asking her those questions, calling into question his subsequent testimony that she had "made up her mind about [defendant's] guilt prior to deliberating." In that regard, Juror No. 1 testified she "was leaning towards guilt, and it seemed like every day it got stronger and stronger and stronger," and that she "came into the courtroom as a juror with an open mind, but every bit of testimony and evidence moved [her] more and more towards guilt."

"Although section 1122 requires jurors not to form an opinion about the case until it has been submitted to them, 'it would be entirely unrealistic to expect jurors not to think about the case during the trial . . . .' [Citation.] A juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so long as . . . her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73.) The record plainly demonstrates that Juror No. 1 kept an open mind. She did not discuss the case or her feelings about defendant's innocence or guilt with any other juror prior to deliberation, nor did she tell Miller she believed defendant was guilty. She "remained engaged throughout the entire trial," as evidenced by the fact that she took notes during the entire trial, summarized the testimony of the witnesses, and submitted questions to those witnesses, all of which was corroborated by the trial court's own contemporaneous observations. Finally, she testified that she deliberated with an open mind and listened to the opinions of other jurors during deliberations. While Miller's testimony painted a different picture, the trial court determined her testimony was not credible, a finding we accept as supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

The trial court's denial of the motion for new trial was not an abuse of discretion.

## II.

### *Evidence of Prior Misconduct*

Defendant contends the trial court erred in admitting evidence of his prior misconduct against J.M. and M.B.

"Section 1108, subdivision (a) provides: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, *if the evidence is not inadmissible pursuant to Section 352.*' (Italics added.) Section 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 736 (*Harris*).)

In *Harris, supra*, 60 Cal.App.4th 727, this court identified five factors relevant to the trial court's consideration of whether the probative value of prior sexual misconduct evidence is outweighed by its prejudicial effect under section 1108: (1) the inflammatory nature of the prior offense evidence; (2) the probability that admission of the evidence will confuse the jury; (3) the remoteness of the prior offense; (4) the consumption of time necessitated by introduction of the evidence; and (5) the probative value of the evidence. (*Id*. at pp. 737-740.) The trial court's ruling under Evidence Code section 1108 is subject to review for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

Here, defendant discusses only two of those factors: probative value (i.e., the degree of similarity between the prior misconduct and the charged offenses) and remoteness. Accordingly, we limit our discussion to those factors as well.

First, defendant argues the prior and current offenses are dissimilar. He relies on *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*) as support for that proposition. In *Jandres* the charges against the defendant included forcible rape and kidnapping to

18

commit rape of an 18-year-old girl. Over the defendant's objection, the trial court admitted, as a sexual offense under section 1108, evidence of a prior kidnapping of an 11-year-old girl during which the defendant put his finger inside the girl's mouth and picked her up and attempted to carry her outside of the house. (*Id.* at pp. 344-347, 349.) The court of appeal found that, while it was not error for the trial court to conclude the prior misconduct evidence constituted a sexual offense, it was error to admit such evidence under Evidence Code section 352. Noting that there were "many differences between the [charged offense and the prior offense]—including the circumstances (daytime attempted burglary in one case, possible stalking and attack at night in the other); the ages of the victims (11 and 18); and the nature of the conduct (inappropriate touching of the mouth in one case, rape in the other)," the appellate court concluded evidence of the defendant's exhibited sexual interest in an 11-year-old girl by putting his finger in her mouth did not rationally support an inference that the defendant was predisposed to rape an 18-year-old woman. Thus, "the prejudicial effect of [the prior misconduct] exceeded its comparatively low probative value." (*Id.* at pp. 354-357.)

Defendant urges us to reach the same conclusion as the one reached in *Jandres.* We decline to do so. Here, the degree of similarity between the current and prior offenses is much more significant. The prior offenses involved two girls, ages 11 and 14. The current offenses involved two boys, ages 9-10 and 10-11. Defendant argues the fact that "the former involved girls and the latter involved boys" renders them too dissimilar based on defense expert William O'Donohue's testimony that it is "uncommon" for a person to sexually molest both girls and boys. We are not persuaded. While O'Donohue testified that most sex offenders "tend to have a preferred age and gender," he did not rule out the possibility, and indeed acknowledged, that some sex offenders are "attracted to both boys and girls."

There are other similarities between the prior and current offenses. In each case, defendant was connected to the victims through his relationship with his daughter, Sarah.

19

Defendant preyed on his victims when no other adults were present and, on occasion, when other children were present. In the prior offense, defendant plied M.B. with alcohol; in the current offenses, he plied J.B. and D.B. with marijuana. In the prior offense, defendant touched J.M. and had her rub his penis with her hand; in the current offenses, he touched J.B. and orally copulated him. Moreover, defendant facilitated even more intimate contact with M.B. when he forced her to have intercourse. Similarly, he facilitated more intimate contact with J.B. and D.B. by trying to get the victims to penetrate his anus with their penises. While there are certainly differences between the prior and current offenses, there are sufficient similarities to render the prior misconduct evidence probative.

Next, defendant argues the prior misconduct is too remote "because [he] was granted probation in 1995 and there was no evidence he tried to molest any children from then until 2008-2009." Characterizing the passage of time between his prior and current offenses as "a nearly-20-year time gap," he likens his case to *Harris*, where we concluded the prior misconduct that occurred some 23 years before the current charges was too remote. (*Harris, supra*, 60 Cal.App.4th at p. 739.) By our calculation, however, defendant committed the charged offenses 13 years after having been convicted of the prior misconduct here. While 13 years is not an insignificant period of time, we do not find the prior offenses to be so remote as to weigh in favor of exclusion.

We conclude the trial court did not err in admitting evidence of defendant's prior misconduct.

### III.

### *Presentence Custody Credit*

Finally, defendant contends that in awarding presentence custody credit, the trial court correctly applied the 15 percent formula (§ 2933.1) to his 693 days of actual custody, but incorrectly calculated the amount of conduct credit as 93 days rather than 103 days. Therefore, he is entitled to 10 additional days of conduct credit, for a total of

796 days of presentence custody credit. The People agree and so do we. We will order the judgment modified accordingly.

## DISPOSITION

The judgment is modified to increase conduct credits to 103 days pursuant to section 2933.1, for a total of 796 days of presentence custody credit. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

     RENNER          , J.

We concur:

     RAYE          , P. J.

     BLEASE          , J.